## McLaughlin *versus* Fulton.

|104  161|
|120   48|

1. If a fund in its original state was impressed with a trust in favor of a certain person, no change of that state can divest it of the trust, and equity will follow the fund through every change for the benefit of the cestui que trust.

2. In an action of ejectment, both parties claimed through one C., who conveyed the land in question to B. On behalf of A., the plaintiff, who was B.'s sister and sole devisee of their deceased mother, it was alleged that a large part of the purchase money paid by B. belonged to the mother, who was then living, and therefore, that B. took title in trust for his mother, though the trust was not mentioned in the deed. The defendants claimed as purchasers at a sheriff's sale, on a judgment against B., repudiating the trust. At this sale the mother had a notice read in which she claimed an interest in the land amounting to $1,650. To establish the trust B. testified that up to 1867, he, with his mother and sister, A., lived on a certain farm in Armstrong county which belonged to the mother; that he sold this farm for her for $3,000; that she advised putting the money into another farm, and he, using his own judgment in the selection of the same, bought another farm, taking the deed in his own name without his mother's knowledge, but using most of the $3,000, for the cash consideration; that all three of them then lived together on this farm for several years, when he sold it also, and bought the property in suit from C. using the fund derived from the sale of the last farm to pay for the same; and that on this last property his mother and sister were still living at the time of the sheriff's sale in 1879. It appeared also that B. had exclusive control of these farms and of his

[McLaughlin *v.* Fulton.]

mother's affairs, she being aged and illiterate. A. was allowed, under objection, to testify to substantially the same facts stated by B. and a verdict and judgment were rendered for the plaintiff, to the extent of her mother's interest in the land.

*Held,* that A. was an incompetent witness, under the proviso to the Act of April 15th 1869, to testify to the facts relating to the title which occurred during the lifetime of the mother; and therefore that the judgment must be reversed.

But *held, also,* that the testimony of B. if believed, was sufficient to justify a submission of the case to the jury; and would, perhaps, warrant a finding in favor of the trust.

And this although no special direction was given by the mother for the purchase of any particular farm with her money.

And although, B. may have first paid $100 of his own money at the time of making the contract for the land in suit, and none of his mother's until afterwards. This on the ground, that when certain funds in the hands of an agent, at the time of a purchase, are his only reliance for procuring the title, he cannot defeat the trust by showing that he has acquired a merely inceptive, equitable interest by the payment of a small amount of his own money at the purchase.

*Held further,* that the possession of the mother, until after the sheriff's sale, was referable to the trust—if the same was established—and in execution of it, and therefore that the plaintiff was not barred by section 6 of the Act of April 27th 1856.

And finally, that in view of such possession and of the notice given at the sheriff's sale, the defendants could not be regarded as purchasers, without notice of the trust.

October 3d 1883. Before Mercur, C. J., Gordon, Trunkey, Sterrett, Green and Clark, JJ. Paxson, J., absent.

Error to the Court of Common Pleas of *Westmoreland county :* Of October and November Term 1883, No. 35.

Ejectment, by Rachel Fulton against William and Lawrence McLaughlin to recover a certain farm or tract of land in Washington township, Westmoreland county.

On the trial, before Hunter, P. J., both parties claimed title through one John Dunn, who had conveyed the land in question on March 28th 1872, to William A. Fulton, the consideration recited in the deed, which was recorded May 7th 1872, being $3,150. On behalf of the plaintiff it was alleged that most of the money paid by William A. Fulton, her brother, belonged to their mother Eleanor Fulton, and therefore that the son held in trust for his mother to the extent of the money paid by her, though no mention was made of this fact in the deed.

Eleanor Fulton died in January 1880 leaving a last will and testament by which she devised all her property real and personal to the plaintiff.

The defendants claimed title as the grantees of the Apollo Savings Bank, which purchased the property on May 12th 1879 at a sheriff's sale thereof, made under an execution issued on a

judgment obtained against William Fulton while the title was in him.    At this sale a notice was given that Eleanor Fulton claimed an interest in the land to the extent of $1,650.

The defendants went into possession under a writ of habere facias, issued in pursuance of a judgment in ejectment obtained by them in 1880, by virtue of their title under the sheriff's sale.

Rachel Fulton brought this suit on September 23d 1880, and in order to show whence the money paid to Dunn came, and thus to establish the trust, put in evidence : a deed from Eleanor Fulton to James S. Ford, dated November 14th 1867, consideration $3,000, for a tract of land in Armstrong county ; a deed by Robert M. Reed to William A. Fulton, dated March 31st 1868, consideration $6,143, for a tract of land in Westmoreland county; and a deed from William A. Fulton to William Sloan, for the last mentioned tract, dated March 29th 1872, consideration $6,143.    It appeared from the testimony, that in 1867 and previous thereto, William A. Fulton, with his mother and sister, all lived together on the property afterwards sold to Ford; which belonged to Eleanor Fulton.    In 1868 they all went to live on the farm which was bought from Reed in the same year, and in 1872 they moved to the Dunn farm (the one in dispute), where they all lived in the same house until 1874, when William was married, and his mother and sister went into another house on the same farm.    In March 1879 William left this property and his mother and sister remained until ejected by the defendants.    During this time William A. Fulton managed the farms upon which they lived, as well as all his mother's affairs, and she, being old and illiterate, trusted him implicitly.

In regard to the money paid for the several farms William Fulton testified as follows: " When the farm was sold to James S. Ford, I conducted the transaction in behalf of my mother. When the money was paid I was present.  . . . . I remember that the money was counted out and laid on the table in the house ; I cannot tell you who took it up.  . . . It was taken in charge by some one in the house: then I took it from my mother's and left it in Bovard's safe in Apollo ; it stayed there until I bought from Sheriff Reed : I got most of the money that I paid Sheriff Reed from that sale ; the same money that Ford paid was paid over to Reed.  . . . .  Altogether there was $2,000 of the proceeds of this sale to Ford paid by me to Sheriff Reed ; the purchase money of the Reed farm amounted to over $6,000 ; there was a good deal of it on credit ; there was over $2,000 or $2,500 that was paid in cash ; the last of the purchase money of the Reed farm was paid to Reed when I sold to Sloan ; I never paid it all out until I sold the farm

[McLaughlin v. Fulton.]

again to James Sloan ; $2,000 of the money I got from Sloan went into the Dunn farm ; that was all the Sloan money that went into it direct. . . . . I purchased that farm from Reed on my judgment ; I was urged by mother to buy a farm ; when that farm was sold to Ford, mother said she wanted the money saved for the purpose of buying a farm ; she urged me to buy one after it was sold, and I did buy it from Sheriff Reed and paid for it in this way ; my mother never knew, by me, that I was taking the deed in my own name ; my mother was born in 1795 ; in 1867, when I sold that farm, she would be seventy-two years of age ; she could not read writing nor write ; . . . . to the best of my recollection I sold the Reed farm in 1872 ; I bargained with James Sloan to sell it ; this bargain was made on the farm ; it was not at the house ; we looked over the farm, and it was up at the upper end of the farm, on the big road, when he said he would take it ; we agreed upon the price of $50 per acre ; . . . . the contract was made sometime in the fall or winter, and the deed was executed about the 1st of April ; or a day or so before it, maybe ; I am speaking of the Sloan sale ; to the best of my knowledge it was the 1st of April, 1872, when that deed was made. . . . . I deposited a good part of the $1,000 that he paid down in the Apollo Savings Bank ; I think I deposited $800 of it . . . I deposited it in my own name ; my mother knew that I had sold the farm ; I did not give her nor my sister any of it ; Sheriff Reed was there at the transaction when the balance was paid by Sloan ; I wrote for him to meet me at Oakland ; if I recollect right the balance I got from Sloan at the time the deed was made was something over $3,000 ; I told you that Sheriff Reed held judgments against this farm, and he met me and got his money at the time of that transaction ; Sheriff Reed was there and he just received what was back on the Reed farm ; I can not distinctly fix the amounts that he and I got ; I said $3,000 ; I think that included the first $1,000 that he gave me when we made the contract ; I think it was something over $2,000 that he paid me when he got the deed ; that I had after paying Sheriff Reed ; I put that $2,000 in my pocket-book and took it home and gave it to a neighbor that evening ; I did not loan it ; I just left it at Jacob Karns', and the next day I was to meet Dunn at Apollo, and I went and got the money and took it over and paid Dunn ; Jacob Karns' daughter was present and I gave it to her and told her to take it down to her father to keep until I called on it ; I paid it the next day to John Dunn ; I made the article with John Dunn in the winter ; I think if it was in December it would be in 1871 ; I think it was in 1872 to the best of my judgment. . . . I think I was to pay Dunn $100 when we drew the

[McLaughlin *v.* Fulton.]

article. . . . . I got the $100 or the part of it that I paid him when the article was made, out of my pocket; I had some money of my own; I suppose this first payment was of my own money; that was paid at the date of the article."

Rachel Fulton was then offered as a witness to prove: the number and condition of her mother's family at her death; that her mother was the owner of the farm sold to Ford; that the money arising from the sale of the Armstrong county property was given by Eleanor Fulton to buy another farm for her in Westmoreland county, and was so used; that the mother, brother and herself occupied all these farms successively until Eleanor Fulton died, and that the witness occupied the Dunn farm until it was forcibly taken possession of by the defendants; all this for the purpose of proving that William A. Fulton was trustee for his mother, Eleanor Fulton.

The defendants objected to this evidence as incompetent under the Act of 1869, because it related to facts occurring during the lifetime of Eleanor Fulton.

Objection overruled and evidence admitted. Exception. (Eighth assignment of error.)

The defendants submitted, inter alia, the following points:

1. "William A. Fulton, having contracted for the purchase of the land; having paid the purchase money; having taken the deed in his own name; and having put it on record; and having gone into the possession of the land; and having paid the taxes, the same being assessed to him, and thus clothed with all the indicia of ownership, although the plaintiff and her mother, Eleanor Fulton, also went into possession along with him, such possession of the mother and daughter would not be in the execution of the alleged trust, and the plaintiff is barred by the provisions of the sixth section of the Act of 22d April 1856 (Brightly's Purdon, page 930), unless the trust arose by the fraud of William A. Fulton or his mother in taking title in his own name."

Answer. "We have called your attention to the Act of 1856, and have only to say that if there was any abuse of confidence on the part of W. A. Fulton, this statute does not apply." (First assignment of error.)

3. "In a case of this kind the court sits as chancellor, and if the evidence is too vague, uncertain or doubtful to establish the equity set up, it is the duty of the judge to withdraw the case from the jury. (See Church and wife *v.* Ruland and wife, 14 Smith 432.) In this case we instruct you, that in the absence of any direct evidence that Eleanor Fulton directed her son William to purchase the Reed farm or the Dunn farm in her name, and in the absence of any evidence that she took any part in the purchase of those tracts of land, or made

[McLaughlin *v.* Fulton.]

any inquiry about the price they cost, and in the absence of any evidence that William used any artifice to induce her to believe that the land had been purchased in her name, although she was living with him, and where the evidence rather tends *to* prove that she allowed her son to use a portion of her money to purchase a farm or farms for himself, together with such money as he might have, the evidence in such case is insufficient to establish the trust here set up, and your verdict should be for the defendant."

Answer. " The first branch of this proposition is correct. But as to the second branch of it we are unwilling to say that there must be proof that there was artifice on the part of William. You have a mother and son ; if the mother reposed confidence in the son and he abused it, she could not be prejudiced. If he did he would be a trustee ex maleficio, and we decline to take the case from the jury." (Third assignment of error.)

5. " If you believe the evidence, William Fulton contracted for the purchase of the Dunn farm in his own name, and paid, at the time the contract was made, about one hundred dollars or less of his own money ; from such a contract no trust could arise in favor of Eleanor Fulton, the mother, as to that tract of land, which is the one in dispute.—The important time at which a trust attaches, if at all, is at the inception of the title, which, in this case, would be when the contract was made for the purchase of the Dunn farm ; and although William may afterwards, when the deed was made, have used a portion of his mother's money to pay the balance of the purchase money due on the land, yet such use of her money subsequent to the inception of the title, would not fasten on it a trust in favor of the mother; and as the plaintiff claims under her mother, your verdict should be for the defendant."

Answer. " We are unwilling to affirm these points as submitted. As a general proposition, where a trust is set up it would be where the contract is first entered into. But as we have repeatedly said, did William use the money of his mother in the purchase of these farms and in the abuse of any confidence which she had in him ? If he did, and used her money when deeds were procured, in good conscience and equity he would be liable." (Fifth assignment of error.)

8. " If the jury believe the evidence, the Apollo bank was a purchaser for a valuable consideration without notice of the trust, if there was one. The written notice given at the sheriff's sale was an abandonment of any implied notice that might arise by the plaintiff and her mother being on the land, and the notice given at the sheriff's sale was inadequate to warn bidders and purchasers of the trust now set up."

Answer. " We think the notice given at the sheriff's sale

was sufficient to put the bank on their guard, that Eleanor Fulton claimed an interest in the land to the extent of $1,650." (Sixth assignment of error.)

Verdict for plaintiff for thirty-three sixty-thirds of the farm, with six and a quarter cents damages and costs; and judgment thereon. Whereupon the defendants took this writ, assigning for error the answers to their points, and the admission of Rachel Fulton's testimony as above noted.

*H. P. Laird* (with whom was *J. A. Marchand*), for plaintiffs in error.—A constructive trust can be raised only from fraud in obtaining the title or from payment of the purchase money at the time of acquiring it: Bickel's Appeal, 86 Pa. St. 204; Cross' Appeal, 97 Pa. St. 471. The right of reclamation is at an end when trust moneys have been so mixed with other funds as to be incapable of identification: Schneider's Estate, 11 Phila. 71; People's Bank's Appeal, 93 Pa. St. 107. The mother gave no direction as to the purchase of the Dunn farm, and there was no prior agreement. A resulting trust cannot be raised by a subsequent payment of the purchase money: Barnet *v.* Dougherty, 32 Pa. St. 371; Nixon's Appeal, 63 Pa. St. 279. The answer of the court to the defendant's eighth point, in regard to the notice at the sheriff's sale, of Eleanor Fulton's claim, was clearly error: Kaine *v.* Denniston, 22 Pa. St. 202; Meehan *v.* Williams, 48 Pa. St. 238; Scott *v.* Gallagher, 14 S. & R. 333. Rachel Fulton's testimony was inadmissible: Chase *v.* Irvin, 87 Pa. St. 286; Ewing *v.* Ewing, 96 Pa. St., 381; Hess *v.* Gourley, 89 Pa. St. 195.

*J. Alexander Fulton* (with whom was *Alexander Eicher*), for defendant in error.—Where the purchase money is paid by one, and the title taken in the name of another, there is a resulting trust, in favor of the one who paid the money, and this may be established by parol: Clark *v.* Trindle, 52 Pa. St. 492; Seichrist's Appeal, 66 Pa. St. 237; Wiser *v.* Allen, 92 Pa. St. 317. These decisions also show that the case at bar is clearly excepted from the Act of April 22d 1856, by the proviso to section 4 of said Act. The conversion of a trust fund into money, and the money into land does not divest the trustee of his fiduciary character; and a court of chancery will follow the fund for the benefit of the cestui que trust, wherever it can be identified, and when the amount of the fund is uncertain, it may be ascertained by a jury: Pierce *v.* McKeehan, 3 W. & S. 280; Reed's Appeal, 34 Pa. St. 207; Coble *v* Nonemaker, 78 Pa. St. 501; Sadler's Appeal, 87 Pa. St. 154. The possession of land is notice of any title under which the occupant claims, unless he has put on record a title inconsistent

with his possession : McCulloch *v.* Cowher, 5 W. & S. 427. Rachel Fulton was a competent witness : Brightly's Purdon, 623, 624, 625, pl. 12, 13, 16, 17, 20 ; Cox *v.* McKean, 56 Pa. St. 243 ; Richter *v.* Cummings, 60 Pa. St. 441 ; Rowley *v.* McHugh, 66 Pa. St. 269 ; Karns *v.* Tanner, 66 Pa. St. 297.

Mr. Justice CLARK delivered the opinion of the court, October 29th 1883.

On the 28th day of March 1872, John Dunn conveyed the title to the lands in controversy to William A. Fulton ; the consideration of the purchase as expressed in the deed being $3,150.

Eleanor Fulton, the mother of William, in her lifetime claimed that the purchase was in part made with her money, and that her son held the title to that extent in trust for her. She died in January 1880, having first made a last will and testament, wherein she devised all her estate, real and personal, to Rachel Fulton, the plaintiff below.

William A. Fulton, having taken the title in his own name, entered it on record on the 7th day of May 1872. He subsequently became largely indebted ; judgments were obtained against him, and the lands in dispute were levied upon by the sheriff, and sold on the 12th day of May 1879, to J. B. Chamber, trustee for the Apollo Savings Bank, for the sum of $1,401. Lawrence McLaughlin having, by deed of 10th June 1881, purchased the title of the Apollo Savings Bank, the defendants below went into possession under the sheriff's title. The subject of this litigation, the thing in action, is the land, and it seems very clear at the outset that Eleanor Fulton, through the operation of her will, is to be taken as the assignor of the land ; her rights therein, whatever they were, passed under it to Rachel, the plaintiff. The title of Rachel was dependent altogether upon the true nature of the transaction involving the purchase of the land from John Dunn ; the conveyance from Dunn formed a link in the chain of her title, as well as of the title of William and Lawrence McLaughlin. Rachel, under the assignment of the will, claimed the alleged trust on the land under William's deed, while McLaughlin claimed under the same title, repudiating the trust. Thus the deed from Dunn is the common source of title to both parties, and the matter of fact in controversy, which is the alleged trust, springs directly out of that transaction. The relations of the parties, therefore, show such privity between them as brings them clearly within the proviso of the Act of 15th April 1869, under the construction adopted in Craig *v.* Brendel, 19 P. F. Smith 153, and other cases.

If William A. Fulton's interest in the land had not been

sold by the sheriff, and this controversy had been one between Rachel and William, there could be no doubt whatever as to the incompetency of both as witnesses, to establish facts occuring in the lifetime of Eleanor. It seems equally clear that if the defendants below, who claim under William, had been called in their own behalf, to prove the acts and declarations of Eleanor, touching the alleged trust, they would certainly have been incompetent for that purpose. The Act of 1869 expressly provides that it "shall not apply" where the assignor of the thing or contract in action may be dead; such actions are to be tried as if the Act of 1869 had not been passed, and, therefore, all parties and interested persons, on both sides, are incompetent to testify as to any facts occurring prior to the death of the assignor.

William A. Fulton was not a party, and as a consequence of the sheriff's sale he appears to be without interest in the suit; but Rachel was a party, and interested in the result. She was, therefore, an incompetent witness for the purpose for which she was offered and examined. The 8th assignment of error is therefore sustained.

The testimony of Rachel Fulton being thus eliminated from the case, it stands mainly upon that of William A. Fulton, her brother. There is perhaps enough left, however, as the case is now presented, to justify a submission to the jury. When the cause is again tried, facts may be developed which would readily justify a different conclusion.

If the testimony of William A. Fulton is believed, however, the $3,000 which was realized from the sale of the Armstrong county farm to Ford, was certainly the money of Eleanor Fulton. The old lady was then seventy-two years of age; she was illiterate, could neither write nor read writing, and was altogether unacquainted with ordinary business matters. The transaction with Ford was conducted by William in behalf of his mother, and it was undoubtedly true, if his testimony is believed, that as a son he occupied in regard to her fiduciary relation of a very peculiar character. When the money was paid, William took charge of it for her. He was then a single man, and conducted the business of the family, and his mother certainly reposed in him the highest degree of confidence, submitting wholly to his judgment without question. He invested a large part of the money received from Ford in the purchase of the Reed farm; as we understand him, he invested $2,000 at the first, and afterwards the proceeds of the sale of the house and lot in Apollo. There does not appear to have been any especial direction given for the purchase of this or any other particular farm, but an investment in land somewhere was contemplated. William bought this tract at his own suggestion,

[McLaughlin *v.* Fulton.]

upon his own judgment, and in his own name, but not with his own money. He says he may have told her that her money went into the purchase, but he never told her of the condition of the title.

Four years later he sold the Reed farm to Sloan, and purchased the Dunn tract, now in dispute. The whole sum realized from this sale, after paying Reed, was about $3,000. Of this sum $1,000 was received by William at the time of the sale in the fall or winter of 1871, and $2,000 in a short time afterwards at the delivery of the conveyance. This fund, or the greater part of it, is distinctly traced into the purchase of the Dunn farm. William testifies that he paid out of money that may have been his own one hundred dollars, or less, at the making of the contract in December 1871, or January 1872, but it is clear that he relied upon the money of his mother then in his hands or control as the means of payment of the purchase. The $100 was perhaps the earnest of the bargain, and he had at the time $1,000 of the money received of Sloan in his hands.

It is certainly true that a resulting trust in lands must arise if it at all, at the inception of the title, either through fraud in the acquisition of it, or through payment of the purchase-money by which it is obtained : Barnet *v.* Dougherty, 32 Pa. St. 371 ; Cross & Gault's Appeal, 1 Out. 471; Fricke *v.* Magee, 10 W. N. C. 50. A distinction is, however, to be taken between a resulting trust properly so called, where the purchaser of lands pays the purchase-money, but takes the conveyance in the name of another, and, what is sometimes so called, when an agent holding a fund for investment purchases with that fund, and takes the conveyance in his own name, as there is a very substantial difference between them both in quality and extent of the relief that can be called for : Wallace *v.* Duffield, 2 S. & R. 521 : Lynch *v.* Cox, 11 Harris 265 ; Bispham's Equity 86 ; Brightly's Eq. 343. In the former case the trust results from the voluntary act of the real purchaser ; in the latter it is implied from the wanton act of the merely nominal purchaser of the land, and the owner of the fund may at his election consider the purchase as made for his use : Phillips *v.* Crammond, 2 W. C. C. 445 ; Oliver *v.* Piott, 3 How. 333. When the fund in the hands of the agent or trustee at the time of the purchase is the purchaser's only reliance and means of payment, and is the instrument in his hands for procuring the title and conveyance, he will not be permitted to defeat the trust by showing he had acquired a merely inceptive equitable interest by payment of an inconsiderable amount of his own money at the purchase. In such case, at the most, he would only be entitled to have his interest determined by an inquiry as to the amount of the

[Riddle's Appeal.]

respective investments. Nor is William's testimony consistent with the presumption of an advancement or loan to him by his mother. He says he conducted the transaction in her behalf, and that, although the titles were taken, and the lands charged with liens in his name, she was ignorant of these facts.

If the fund, in its original state, was covered with a trust in favor of the mother, no change of that state can divest it of the trust, and, in accordance with this principle, equity will follow the fund through every transmutation for the benefit of the cestui que trust.

The case rested mainly upon the testimony of William A. Fulton. If his statement of the facts is a correct one, the property in dispute was paid for to a large extent with the money of Eleanor Fulton; his testimony to that effect, if believed, is clear and unequivocal and justified a submission to the jury. His credibility was a question for the jury.

The possession of Eleanor Fulton, although not exclusive, covered the entire period of the alleged trust, until after the sheriff's sale, and must, if the trust be established, be referable to it and in execution of it, as every possession where there is title is supposed to be in subordination to it. The plaintiff was therefore not barred by the provisions of the 6th section of the Act of 27th April 1856 : Clark *v.* Trindle, 2 P. F. Smith 492 ; Douglass *v.* Lucas, 13 P. F. Smith 9.

Nor can the defendants below be regarded as purchasers without notice. The possession of Eleanor Fulton was exclusive at the time of the sale, and was notice of title to the whole world, and actual personal notice was given at the sale. The notice at the sale, explained the possession, defined the claim under it, and thus purchasers were fully informed of the nature of her title.

Judgment reversed, and venire facias de novo awarded.