# APPEAL OF CHARLES C. BAKER, ET AL.
## [IN RE TRUST ESTATE OF ANNA M. DEAL.]

120          33
e 21 SC ¹129

FROM THE DECREE OF THE ORPHANS' COURT OF PHILADEL-
PHIA COUNTY.

Argued March 23, 1888—Decided April 16, 1888.

1. A trustee will not, under any circumstances, be allowed to make a profit out of the trust fund; whatever profit arises in any way therefrom belongs to the owner of the fund and not to its custodian: Norris's App., 71 Pa. 125.
2. When a trustee, at his own sale under order of court, purchases lands of the trust estate, using practically the trust funds in payment therefor, the profits made on a re-sale belong to the cestuis que trustent, even though the order of sale allow the trustee to become a bidder.

Before PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; GORDON, C. J., and TRUNKEY J., absent.

No. 183 January Term 1888, Sup. Ct.; court below, No. 298 January Term 1884, O. C.

On January 20, 1887, an account was filed by Charles C. Baker, entitled the first partial account of Charles C. Baker,

Adjudication.

George W. Baker and Caroline Haman, trustees of Anna M. Deal, under the will of George Baker, deceased, in which the accountants for amounts awarded by the Orphans' Court out of the estate of George Baker, deceased, were

| | | | |
|---|---|---|---:|
| Charged, June 12, 1884, | . . . . . | | $201.02 |
| November 10, 1884, | . . . . | | 1,741.33 |
| Interest, . . . . . | $111.36 | | |
| Credited, various payments and expenses, | 106.15 | | |
| | | | |
| Balance for distribution, | . . | $5.21 | |
| | | | |
| Amount of principal, | . . . | | $1,942.35 |

On March 11, 1887, this account was called for adjudication before PENROSE, J., whose opinion, filed on March 25, 1887, clearly showing the questions of fact and law appearing and decided, was as follows:

Though in the name of three persons as trustees, the account is actually that of Charles C. Baker and Caroline Haman only; George W. Baker, the other person mentioned, having had nothing to do with its preparation or filing, and his position being antagonistic to that of the other two.

The trust to which it relates arises under the will of George Baker, who died April 25, 1882. The will, which was proved May 8th, of that year, directs the conversion of his residuary estate, real and personal, at such times and in such manner as his executors should deem most advantageous to the interests of the estate; the proceeds to be divided into eight shares, of which one should be given to each of his children, Caroline Haman, Charles C. Baker, Julia E. Castor, George W. Baker, and Abram Baker; one to his executors in trust for his step-son John R. Rausch for life, with remainder to the children of his said step-son; one to the executors in trust for his grand-son Harry C. Baker until his arrival at the age of twenty-one years, and then to his said grandson absolutely; and one to his executors in trust for his daughter Anna M. Deal for life, with remainder to her children in equal shares.

The trusts were substantially in the same terms; that for Mrs. Deal being as follows: "One other full equal one eighth part thereof I order and direct my said executors or the sur-

Adjudication.

vivor of them to put out and place the same at interest on good real estate or other sufficient security, as they shall think best and proper, and to pay over the interest, income and profit arising therefrom from time to time when and as often as the same has been gotten in and received by them unto my beloved daughter, Anna Maria Deal, wife of Charles Deal, for her sole, separate and exclusive use and benefit, for and during all the term of her natural life; and from and immediately after the time of the decease of the said Anna Maria Deal, then I give and bequeath the said one full equal one eighth part of my said residuary estate unto the children of said Anna Maria Deal then living, their heirs and assigns."

The executors named were Caroline Haman, Charles C. Baker and George W. Baker, all of whom joined in taking out letters testamentary.

In March, 1884, the executors sold a tract of about ten acres of the real estate of the testator for $13,607.10 and soon after filed their first account. This account was duly adjudicated in May, 1884, and the balance remaining after payment of debts, etc., awarded in accordance with the terms of the will. The amount awarded to the executors in trust for Mrs. Deal was $201.03; similar amounts being awarded to them in trust for John R. Rausch, or as he was also called, Baker, and for Harry C. Baker.

The sum awarded in trust for Mrs. Deal was retained by Mrs. Haman, one of the executors, and used in her business, she agreeing to pay to the cestui que trust six per cent. interest. The shares belonging to the trusts for John R. Rausch and Harry C. Baker were retained by Charles C. Baker, and blended with his own moneys.

In October, 1884, a petition was presented to the court by Ellwood P. Wright, setting forth that the petitioner had obtained judgment against the executors as garnishees of George W. Baker, for $1,476.52; that they refused to sell the remaining real estate of the testator (about twenty-eight acres), though, in the opinion of the petitioner, it was to the best interests of the estate that it should be sold; and that George W. Baker, the defendant in the judgment was also one of the executors. The prayer was for an order upon the executors to forthwith offer the said real estate for sale. The petition

Adjudication.

was demurred to, on the ground that the discretionary power of the executors with regard to the time and manner of sale could not be interfered with by the court, and that in their judgment it was not to the best interests of the estate to make the sale at that time. The demurrer was overruled, with leave to answer; and no answer having been filed, a decree was entered as follows:

" And now, December 6, 1884, at an Orphans' Court this day held for the county of Philadelphia the parties petitioner and respondents appear by their respective counsel, and counsel for respondents says that he has no further answer to make to said petition; whereupon after due consideration the court do order and direct that the said executors do forthwith proceed to sell all the remaining real estate of the said George W. Baker, deceased, at public auction after due and full advertisement, with notice to petitioner's counsel, in the usual manner. And it is further ordered that all persons in interest be permitted to bid at such sale, including such executors. Due return of sale to be made to the court"

The sale so ordered took place January 28, 1885. The property was purchased by George W. Haman, " in trust to convey the same to Charles C. Baker, Caroline Haman and Julia E. Castor, their heirs and assigns," for $13,900. Return was duly made, and the sale was confirmed March 18, 1885.

An account of the proceeds of this sale was filed April 29, 1885, showing a balance in the hands of the accountants of $13,349.11. By the adjudication of this account, $1,741.32 each, were allowed to the executors in trust for Anna M. Deal, for John R. Rausch, for Harry C. Baker, to Caroline Haman, to Julia E. Castor and Charles C. Baker; and the shares of George W. Baker and Abram Baker, as follows: To executors of Thomas Castor, attaching creditors of George W. Baker, $284.79; to Conrad Urban, attaching creditor of George W. Baker, $310.44, and to Charles C. Baker, assignee of George W. Baker, $946.10. To Conrad Urban, attaching creditor of Abram Baker, $310.45, and to Charles C. Baker, assignee, $1,030.87.

Exceptions to the allowance to Charles C. Baker, as assignee of George W. Baker and Abram Baker, filed by Ellwood P. Wright and William C. Hutchinson, attaching creditors, were

sustained by the court in banc and the amount so allowed, aggregating $1,976.97, awarded to the exceptants. Upon appeal, this decree was affirmed and the record remitted April 6, 1886.

The adjudication had been filed July 3, 1885 . . . . . In the account, the accountants were debited with the receipt of the proceeds of sale March 14, 1885.

The property for which Mrs. Haman, Mrs. Castor and Charles C. Baker thus paid, or professed to pay $13,900 was sold by them to Disston & Company in February, 1887, for $28,000, out of which they paid to the agent effecting the sale $500, leaving a profit of $13,600.

The present account debits the accountants (Mrs. Haman and Charles C. Baker, being as already stated, the real accounting parties) with the $201.01 awarded by the adjudication of May, 1884, and the $1,741.33 awarded by the adjudication of July 3, 1885, with interest from the date of the alleged receipt of the sums to November 10, 1886, at five per cent.

Mr. Finletter on behalf of Mrs. Anna M. Deal, asked that they should be surcharged with the share of the profits received upon the re-sale of the property to Disston & Company; basing the claim, first, upon an alleged express agreement and second, upon the relation of trust existing between the parties.

After the sale had been ordered by the court upon the petition of Ellwood P. Wright, the attaching creditor of George W. Baker, a meeting of the family took place for the purpose of considering what course should be pursued with regard to the sale. According to the testimony of the witnesses called by Mr. Finletter, it was then agreed that the property should be bought by Mrs. Haman, Mrs. Castor and Charles C. Baker and held for the common benefit. According to some of these witnesses, there was an agreement in writing setting forth how the intended purchase was to operate, but the terms of this paper, if it ever existed, were not recollected, and no such paper was produced. On the other hand, Mrs. Haman and Charles C. Baker swore positively that no agreement, such as alleged, either in writing or by parol, was ever entered into, and that the purchase was for the exclusive benefit of the persons named as purchasers. Mrs. Castor would doubtless have testified to the same effect, but pending

Adjudication.

the proceedings before the auditing judge and before she could be called as a witness, she was taken sick and was compelled to leave the court room.

If the parties stood to each other in the relation of strangers, the auditing judge would be compelled to hold that the evidence was insufficient to establish an express trust, and the claim to surcharge would have to be refused.

So too if the case was merely that of a purchase by executors at their own sale. The sale was under the order of court in (apparently) an adverse proceeding with permission to the executors to bid, and with a subsequent confirmation by the court: such a purchase, under the doctrine recognized in Pennsylvania, in Fisk v. Sarber, 6 W. & S. 27; Chorpenning's Appeal, 32 Pa. 315, must be conceded to be valid, especially as against persons participating in their own right, by themselves or their creditors, in a subsequent distribution of the proceeds. A purchase by a trustee is voidable, not void: and a receipt by the beneficiary, under no disability, and with full knowledge of all the facts, of his share of the purchase money, may operate as a ratification, and estop him from questioning its validity. Such estoppel, however, could not arise in the case of Mrs. Deal, or of the other persons whose participation in the proceeds of the sale was only through the executors themselves in their capacity as trustees.

But the executors were not executors merely. When their functions as executors ceased, their duties as trustees for the shares which were directed to be held in trust began, and this relation created a new disability in the way of their becoming purchasers. The principles with regard to trustees are familiar and perfectly well settled. The law exacts the most unswerving fidelity to the cestuis que trustent, and without regard to honesty of motive, will not permit the trustee to derive in any manner a profit or personal advantage from the trust property, and this even though the advantage would be lost if not taken by him; as in the case of a renewal of a lease which the lessor had refused to the cestui que trust: Featherstonhaugh v. Fenwick, 17 Vesey 298; Perry on Trusts, § 196; Johnson's Appeal, 115 Pa. 129. Whatever can be gained by the personal effort of the trustee belongs to the cestui que trust. "The trustee cannot use the trust property,

Adjudication.

nor his relation to it, for his own personal advantage. All power and influence which the possession of the trust fund gives, must be used for the advantage and profit of the beneficial owners, and not for personal gain or emolument of the trustee. No other rule would be safe; nor would it be possible for the courts to apply any other rule as between trustee and cestui que trust: " Perry on Trusts, § 427, citing many authorities.

In the present case, the necessity for the sale arose solely from the attachment of the shares of two out of eight distributees. The value of the entire property being fixed by the sale for $13,900, $3,475, or two eighths, was the utmost that was required for the preservation of the estate to the remaining six owners; and before the sale took place the accountants had ascertained, as the evidence shows, that they could raise $4,500 by mortgage of the property. There can be no doubt, if application had been made to the court, that specific authority to the trustees to unite with the other owners in thus raising the money and taking the property at the amount of the bid would have been given, if indeed it was not already conferred by the permission in the decree ordering the sale "to all persons in interest" to become bidders; the trustees were certainly included in the language thus used. If there was any doubt upon this subject, it was not too late after the property had been struck down to the accountants and Mrs. Castor, to make an application on behalf of the cestuis que trustent to the court. The price was a low one; somewhat larger, it is true, than the assessed value ($11,200), but $1,100 less than the amount to which the purchasers had agreed to go; far less than the price at which the adjoining property had sold the year before, and less than one half of what this very property has since, within two years of the sale, been disposed of for. Can it be possible, under these circumstances, that trustees without making an effort to secure the interests of their cestuis que trustent, may avail themselves of opportunities furnished by the property itself to become the purchasers, and hold for their own exclusive benefit? There was evidence that Charles C. Baker made efforts to deter bidders at the sale, by representing that he intended to buy in for the family. It is true this is positively denied by him, but one thing is certain: The

Adjudication.

decree gave leave to the "executors" to purchase; Mr. Stover was known to be counsel for the executors; and the bidding was by him. Persons attending the sale, therefore, would naturally assume that he was acting for the executors as the representatives of the family, and would as a consequence, refrain from bidding against him. Thus an additional advantage would be gained to the prejudice of the cestuis que trustent.

But there was much more than this. Though the amount of the bid, $13,900, was debited in the account of April, 1885, as received March 14, 1885, the only money actually paid by the purchasers was the $500 required by the conditions of sale to be paid to the auctioneer, and the $4,500 which, at some time subsequent to the deed to them, were raised on mortgage in pursuance of the understanding, already referred to, made with the mortgagee prior to the sale. The purpose of this mortgage, as testified by Mrs. Haman and the husband and agent of Mrs. Castor, was merely to raise money to pay the creditors attaching the shares of George W. Baker and Abram Baker. Not a dollar was paid for the trusts for Mrs. Deal, John R. Rausch or Harry C. Baker. Even after the adjudication of July 3, 1885, had specifically awarded payment, no money was paid for these trusts. During all this time, if judgments had been obtained against the purchasers, if their ownership was to the exclusion of the cestuis que trustent; the property might have been swept away and the cestuis que trustent cut out altogether. It was not until November, 1886, after Mrs. Deal had taken steps to assert her rights, that a second mortgage for $5,000 was created, and the amount awarded for her trust deposited to the credit of Charles C. Baker as trustee. From the date of the sale up to this time, no interest whatever was paid or offered to be paid to Mrs. Deal, though the will provided that her share of the estate should be placed on interest "on good real estate or other sufficient security . . . . . and interest, income and profits arising therefrom from time to time when and as often as the same has been gotten in and received," paid to her. There was affirmative evidence, which was not contradicted, that Charles C. Baker, at various times when the subject of interest was spoken of, by or on behalf of Mrs. Deal, had declared that her money remained in the property and that she would participate in the profits arising from a re-sale.

Adjudication.

Apart from this evidence, however, it is apparent from what has been said, that the money belonging to the trust for Mrs. Deal remained in the property, and that the accountants availed themselves of their position as trustees to enable them to become purchasers without the payment of anything from their own pockets. The effect, therefore, in law, is precisely the same as if having the actual custody of trust funds they had used them in making the purchase.

It was testified by Mr. Castor, that the only money which his wife was called upon to contribute toward the purchase was one third of the $500, paid to the auctioneer. This is true also as to Mrs. Haman and Charles C. Baker, with the important difference, that they each held, not for the cestuis que trustent but for themselves, the trust moneys awarded by the adjudication of 1884, amounting in all to more than the whole $500.

It was contended by Mr. Stover that as Charles C. Baker claimed that the shares of George W. Baker and Abram had been assigned to him prior to the attachments, it was supposed that no part of the purchase money would have to be paid to the attaching creditors ; and that, therefore, the hand-money and moneys raised by mortgage were sufficient to pay the shares held in trust. The assertion is in conflict with the testimony of Mrs. Haman and Mr. Foster and with the decision of the court. Mrs. Haman said: "Mrs. Castor, Charles and myself joined in. There was $500 paid by the three of us. We had to borrow the money to pay the boys' creditors." And how, it may be asked, would it have been possible to pay three shares, amounting in all to $5,223.99, with $5,000, even had the latter sum not been reduced by the expenses of sale and other payments credited in the final account? But as already stated, in point of fact the money was not so applied. The trust shares remained in the property, and their retention there made the purchase possible without the expenditure of a dollar of the individual means of the nominal purchasers, who now, after having so had the benefit of this use, seek to retain for themselves a profit exceeding the sum at which the property was struck down to them.

If, indeed, the fact be as contended by Mr. Stover, the case assumes a still more serious aspect. If the shares of George

W. Baker and Abram Baker had been assigned to Charles C. Baker before the attachments, why was the sale permitted at all? Why, after the demurrer was overruled and leave given to answer, did the executors instruct their counsel to say to the court, as set forth in the decree, "that he has no further answer to make to said petition?" If in point of fact there had been the assignment, it would have been a complete defence; and in this view of the case, the sale, which might have been prevented, may be said to have been procured by the executors, and the purchase by them or any of them would not be protected by the doctrine of Fisk v. Sarber, 6 W. & S. 27: Parshall's Appeal, 65 Pa. 224.

It only remains to consider what proportion of the profits belongs to Mrs. Deal's trust. The first impression of the auditing judge was that it was one eighth, but subsequent reflection has led him to a different conclusion. The interests of George W. Baker and Abram Baker were wiped out by the executors' sale and the award to their creditors of their shares of the proceeds. The purchase by Mrs. Haman, Mrs. Castor and Charles C. Baker, without the payment of any of their own moneys except, perhaps, the insignificant sum deposited with the auctioneer, having been accomplished by the retention of the shares belonging to the several trusts, the proportions belonging to the latter are to be measured by the number of persons acquiring an interest by reason of such purchase. This will give to each one sixth. It is clear, however, so far as Mrs. Castor is concerned, that her liability cannot be enforced in the Orphans' Court. She was not an executor or trustee; and while it was held in Guillou v. Peterson, 89 Pa. 163, that a partner of an executor having knowledge of the use of trust property for the benefit of the firm was liable to the cestui que trust, the question as to her can only be considered in the Court of Common Pleas. And hence, it follows, the accountants can only be surcharged with the share of the profits actually received by them; Seguin's Appeal, 103 Pa. 139; Vyze v. Foster, 8 L. R., Ch. Ap. 309; s. c. upon appeal, L. R. 7 H. L. 318.

The property having been bought in for $13,900, and sold for $28,000, less a commission to the broker effecting the sale of $500, the entire profits were $13,600, of which two thirds,

Adjudication.

$9,066.66, were received by the accountants, Mrs. Haman and Charles C. Baker. One sixth of this sum, $1,511.11, is the proportion belonging to Mrs. Deal's trust, and Mrs. Haman and Charles C. Baker will be surcharged as her trustees accordingly. No part of the moneys mentioned in the account or arising from the re-sale, has ever come into the hands of the accountant George W. Baker.

The account will be restated as follows :—

| Dr. | PRINCIPAL ACCOUNT. | |
| --- | --- | --- |
| 1884, June 12, To amount awarded by adjudication of first account . . . . . . . . . . . . | | $201.02 |
| 1885, Nov. 10, Amount awarded, but not paid by second adjudication . . . . . . . . . | | 1,741.33 |
| 1887, Share of profits on re-sale received by Mrs. Haman and Charles C. Baker as above . . | | 1,511.11 |
| | | 3,453.46 |
| Cr. By one sixth of deposit at sale . . . . . | | 83.33 |
| | | $3,370.13 |

As against this amount Mrs. Haman and Charles C. Baker are entitled to credit for the proportionate part of taxes, etc., upon the property, accruing between the date of the purchase and the final sale, unless rents were received during this time, in which case the payment so made will be credited against such rents, and the accountants charged in the income account with the proportionate share of Mrs. Baker of the next balance, estimated upon the above basis.

[Here follows an incomplete income account.]

Should the above account, when completed, show a balance of income in the hands of the accountants, it will be paid to Mrs. Anna M. Deal; should the balance be found due the accountants, it will be paid out of the future receipts of income.

The information necessary to enable the auditing judge to complete the foregoing restatement of account will be furnished to him by the accountants within ten days from the filing of the adjudication; and, unless so furnished, the statement of counsel from the exceptant will be received as correct.

The balance of principal fund as above will be invested as directed by the will of the testator, and held the purposes of the trust.

It is ordered and adjudged that the account as restated be confirmed nisi upon payment of clerk's fees, and that the principal be held and the income applied as hereinabove directed.

Since filing the foregoing adjudication, the auditing judge has been informed by Mr. Stover that the assignments alleged to have been made to Charles C. Baker by George W. Baker and Abram Baker were not for their interests, but simply, in the one case, for $1,604.70 and in the other for $1,875. These sums it is true, with amounts due to creditors whose attachments were admittedly prior to the alleged assignments, are considerably in excess of the shares of the assignors in the price at which the property was sold in January, 1885; but as it could not have been said in advance of the sale what the price would be, such partial assignments of course, would not have furnished an answer to the petition by the attaching creditors for the order of sale. Injustice, therefore, has been done Mr. Stover in asserting that it was in the power of the executors to have prevented the sale.

The result, however, is not changed by striking out all that is said in the adjudication upon this subject. The fact still remains that the trustees availed themselves of their position as such and of their control of the shares of their cestuis que trustent to purchase the property without the payment of anything from their own means beyond the amount deposited to the auctioneer, and without any effort on their part to secure the benefit of the purchase for the cestuis que trustent. This, as the adjudication shows, is quite sufficient to prevent them from excluding the cestuis que trustent from a participation in the profits derived from the transaction.

Various exceptions, filed to the foregoing adjudication by Charles C. Baker and Caroline Haman, alleging error in surcharging the accountants with any sum whatever, came before the court in banc for hearing and on May 28, 1887, were disposed of by an opinion by HANNA, P. J., which after a recital of facts proceeded:

About February, 1887, the purchasing executors sold the tract of land which they ostensibly purchased for $13,900 to Messrs. Disston & Co., for $28,000, out of which they paid their agent for effecting the sale $500, thus leaving a profit of $13,600. If when they purchased the land at the sale ordered by the court they had actually paid in cash the proportion due their cestuis que trustent and upon the settlement of their account, set apart and invested the awards to them as trustees, they then would have shown their good faith in the purchase, which by the decree of the court they were authorized to make. They were not bound to pay into their hands as executors the amount of their own distributive shares, unless needed for payment of debts or incumbrances upon the land, but it was their duty as purchasers, to pay and be prepared to account for, the remainder of the purchase money in cash. And having neglected this duty even up to the date of the final confirmation of their account, and the decree of distribution, and retained the amount in the land they purchased, by their subsequent sale to Messrs. Disston & Co. at a large profit, we have clearly and undeniably a case of trustees speculating with money of their cestuis que trustent. And when they account to their cestuis que trustent they conceal their profitable speculation, and say that all they have in their custody and trust for her, is her share of the original sum of $13,900, which they professed to have received in March, 1885, but which they never did actually pay to themselves as trustees.

If such dishonest and fraudulent conduct and practices by those acting in the sacred trust and confidence of fiduciaries, be permitted to pass unnoticed and unpunished, justice is indeed blindfolded. The conduct of these trustees cannot be justified upon any pretext. They cannot even shield themselves behind the too common plea of ignorance, which would be of no avail. Nor were they without the advice of learned and able counsel; and they cannot be permitted to take to themselves the profit of their venture with moneys not their own.

That this is the well settled principle of law and common justice needs no authorities to establish. Whatever is lost by a trustee in dealing with moneys of his cestui que trust must be

borne by himself; and whatever is gained, belongs to his cestui que trust. " The trustee cannot use the trust property nor his relation to it for his own personal advantage. All the power and influence which the possession of the trust fund gives, must be used for the advantage and profit of the beneficial owners, and not for the personal gain or emolument of the trustee. No other rule would be safe; nor would it be possible for courts to apply any other rule as between trustees and cestui que trust:" Perry on Trusts, § 427, cited by the auditing judge.

Trustees who mingle moneys of the estates with their own, and use the same in their own private business, will be charged with interest or profits as may be claimed, and deprived of their commissions: Robinett's Appeal, 36 Pa. 174; Seguin's Appeal, 103 Pa. 139; Ashton's Estate, 18 W. N. 102; Williamson's Estate, 18 W. N. 138; Waylan's Estate, 1 Pa. C. C. R. 366.

The duty of trustees is a joint one and each is responsible for the neglect of the other: Weigand's Appeal, 28 Pa. 471; Hilles's Estate, 13 Phila. 402.

And as CLARK, Justice, says, in McLaughlin v. Fulton, 104 Pa. 171: " If the fund in its original state was covered with a trust . . . . no change of that state can divest it of the trust, and in accordance with this principle equity will follow the fund through every transmutation for the benefit of the cestuis que trustent."

Without further addition to what is so well said by the auditing judge, we think from the facts appearing in evidence it is clearly established that the trustees are liable to account to their cestui que trust for her proportion of the profit realized in the sale to Messrs. Disston & Co., and they are properly surcharged therewith.

The exceptions are dismissed and adjudication confirmed.

Thereupon the exceptants took this appeal assigning in several specifications that the court erred in not sustaining the exceptions filed to the adjudication.

*Mr. George Junkin* (with him *Mr. Joseph DeF. Junkin* and *Mr. Lewis Stover*), for the appellants:

1. The sale ordered was not one made by the executors, or

sought by them; they merely acted as executors, or agents of the court; not as the executors of the will, but as a sheriff acts, or a special trustee. They had no control over the time of sale, or the division of the property, or the price, for they were to make due return to the court. The purchasers acquired no absolute right to the land sold, until the court confirmed and approved what its agents the executors had done: See Demmy's App., 43 Pa. 155, 168; Morgan's App., 110 Pa. 271. Moreover, it was ordered that "all persons in interest be permitted to bid at such sale, including said executors." It follows, that as soon as the decree of confirmation was entered the purchasers became the owners of the property absolutely and individually, and charged with no duty or trust for any of the legatees or parties named in the will.

2. Fisk v. Sarber, 6 W. & S. 27, decided that the assignee of an insolvent was not capable, by reason of his fiduciary character, of becoming the purchaser of the debtor's real estate when sold by the sheriff upon a mortgage antedating the assignment. Chorpenning's App., 32 Pa. 315, is to the same effect. But it was said in Parshall's App., 65 Pa. 224, that "the doctrine of that case (Fisk v. Sarber) must be received with the necessary qualification, that the judicial sale has not been brought about by the act or procurement of the trustee." And in the latest case, Patterson's App., 118 Pa. 571, it is given as "the well-established rule, that a trustee will not be allowed, unless by leave of the court first had, to purchase the trust property at his own sale, nor in any manner to make a profit out of the same." The sale and purchase by the trustees was clearly within these principles.

3. Two errors of the court below are fundamental: (1) In holding that "the executors were not executors merely. When their functions as executors ceased, their duties as trustees for the shares which were directed to be held in trust, began, and this relation created a new disability in the way of their becoming purchasers." (2) In holding that the trustees, whom the court allowed to become purchasers and to whom the court confirmed the sale at the then fair market value, are to be converted from purchasers for themselves into purchasers for their cestuis que trustent, and be charged with the profits made upon a re-sale two years afterwards.

*Mr. Robt. W. Finletter*, for the appellee:

As a proposition of law, if the facts of this case are as found by the auditing judge, there can be no question as to the right of the cestuis que trustent to participate in the profits: Perry on Trusts, § 427; McLaughlin v. Fulton, 104 Pa. 171.

OPINION, MR. JUSTICE PAXSON:

We might well affirm this decree upon the opinions of the court below and the auditing judge. They both cover the ground fully, and the only reason we add one word thereto is to emphasize the principle upon which their decree rests, that a trustee will not, under any circumstances, be allowed to make a profit out of the trust funds. Whatever profit arises therefrom in any way belongs to the owner of the fund, and not to its custodian. As was said in Norris's Appeal, 71 Pa., at page 125: "It is a well-settled rule that where a trustee speculates with the trust funds he may be held to profits or interest at the option of the cestui que trust. Profits, if the investment has been successful, and interest, if it has been disastrous. In no event will the trustee be allowed to make a profit out of the trust fund. The law holds out no inducements to trustees to so misapply the estate. He may lose, but he cannot make by so doing. It is equally clear that when the trust funds can be fairly traced into the purchase of any particular stock, the latter shall be held to belong to the estate, if the cestui que trust so elect. The cases upon this point are numerous and strong." In addition to the authorities there cited we may add Seguin's Appeal, 103 Pa. 139; McLaughlin v. Fulton, 104 Pa. 161. But a principle so familiar hardly needs a reference to cases.

I will not speculate upon what might have been the result if these executors had made a clean transaction of the sale held under the direction of the Orphan's Court, and had actually paid in cash the proportion due their cestuis que trustent, and had subsequently, as was said by the court below, invested the amounts awarded to them as trustees upon the settlement of their account. The auditing judge, and the court below, have distinctly found that they did not do this. On the contrary, the money of their cestuis que trustent was practically used in this purchase, and when they sold the property, subsequently, to the Disstons at a profit of $13,600, they were selling property which

the money of the cestuis que trustent had in part at least paid for. Hence the profits belonged to those whose money was used for this purpose. This is the law of every decided case in Pennsylvania, and we are not disposed to permit a principle so essential to the proper management of trust funds to be undermined or impaired in the slightest degree.

The decree is affirmed, and the appeal dismissed at the costs of the appellants.