**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| PENNSYLVANIA ENVIRONMENTAL DEFENSE FOUNDATION, | : | No. 64 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court dated July 29, |
| | : | 2019 at No. 228 MD 2012 |
| | : | |
| v. | : | ARGUED: September 17, 2020 |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| AND GOVERNOR OF PENNSYLVANIA, | : | |
| TOM WOLF, IN HIS OFFICIAL CAPACITY | : | |
| AS GOVERNOR, | : | |
| | : | |
| Appellees | : | |

**OPINION**

**JUSTICE DONOHUE**                                        **DECIDED: July 21, 2021**

**I. Introduction**

This decision is the final resolution of a lawsuit brought by the Pennsylvania Environmental Defense Foundation ("PEDF") challenging amendments to the Fiscal Code[1] by the Pennsylvania General Assembly that diverted to the General Fund revenues generated from oil and gas leases on state forest and game lands. The challenge

---

[1] Specifically, the PEDF challenged 72 P.S. §§ 1602-E, 1603-E, 1604-E, and 1605-E, as well as a provision of the Supplemental General Appropriations Act of 2009. Act of Oct. 9, 2009, P.L. 779, No. 10A, § 1912.

asserted that the legislation was violative of Article I, Section 27 of the Pennsylvania Constitution,[2] typically referred to as the Environmental Rights Amendment (the "ERA").

This case returned to the Commonwealth Court following *PEDF II*,[3] where this Court adopted the plurality approach in *Robinson Township, Washington County v. Commonwealth*, 83 A.3d 901 (Pa. 2013), and held that the ERA created a constitutional public trust that is subject to private trust principles. Applying trust law, we determined that royalty revenue streams generated by the sale of gas extracted from Commonwealth lands represents the sale of trust assets and must be returned to the corpus of the trust. To the extent that 72 P.S. §§ 1602-E and 1603-E diverted royalties to the General Fund, we found the provisions violated the ERA. We lacked sufficient advocacy to determine if the remaining three revenue streams, consisting of large upfront bonus payments, yearly rental fees, and interest penalties for late payments that were allocated to the General Fund under Sections 1604-E and 1605-E, as well as Section 1912 of the Supplemental

---

[2] The text of Article I, Section 27 states as follows:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27.

[3] This opinion is the fourth decision of this line. Because the caption is identical in all four cases, for ease of clarity we provide the full citations here. The initial decision was reported at *PEDF v. Commonwealth*, 108 A.3d 140 (Pa. Commw. 2015) (*"PEDF I"*). We reversed and remanded in *PEDF v. Commonwealth*, 161 A.3d 911 (Pa. 2017) (*"PEDF II"*). The decision entered on remand that was appealed here today is found at *PEDF v. Commonwealth*, 214 A.3d 748 (Pa. Commw. 2019) ("*PEDF III*").

General Appropriations Act of 2009, also constituted the sale of trust assets. We were thus not able to adjudicate whether the diversion of these revenue streams to the General Fund violated the ERA. We instructed the Commonwealth Court, inter alia, that, "to the extent that the lease agreements reflect the generation of revenue streams for amounts other than for the purchase of the oil and gas extracted," its role was to determine "in the first instance and in strict accordance and fidelity to Pennsylvania trust principles ... whether these funds belong in the corpus of the Section 27 trust." *PEDF II*, 161 A.3d at 935-36.

On remand, the Commonwealth Court, sitting en banc, determined that the three revenue streams did not constitute the sale of trust assets. The court concluded that "proceeds designated as 'income' are not required to remain in the corpus of the Section 27 trust and used solely for the conservation and maintenance of our public resources," and therefore "may be appropriated for General Fund purposes." *PEDF III*, 214 A.3d at 774. It concluded that these incomes could be distributed between two classes of beneficiaries: (1) current Pennsylvania citizens, which the court treated as life tenants, and (2) future generations, treated as remaindermen under its analysis. It further determined that, per a 1947 statute governing the distributions of income that was the law at the time of the ERA's enactment, one-third of the revenues could be used for non-trust purposes and the remaining two-thirds must be returned to the trust. This outcome corresponded to the court's conclusion that the ERA created life tenants (entitled to the one-third as income) and remaindermen (entitled to the remaining two-thirds as principal that must be reinvested). The court deemed it "necessary to make this analogy" to life

tenants and remaindermen because of the unique legal issues involved in mineral rights. *Id.* at 761.

We find that the Commonwealth Court's holding is at odds with our decision in *PEDF II*, principles of private trust law, and the plain language of the ERA. As explained in this opinion, we agree with the Commonwealth Court that all three revenue streams at issue qualify as incomes generated from trust assets. However, the viability of the Commonwealth Court's holding turns on its erroneous conclusion that the ERA created successive beneficiaries in the form of life tenants and remaindermen with entitlement to income. Another remand is unnecessary, however, as the record is now sufficiently developed and based upon that record we hold that the incomes generated under these oil and gas leases must be returned to the corpus. As a result, we reverse the decision of the Commonwealth Court.

## II. History

The dispute in this case centers on natural gas deposits located within the Marcellus Shale gas formation and the ERA's role as a constraint on the Commonwealth's promotion of the oil and gas industry, including its leasing of Commonwealth lands for commercial purposes. While our opinions in *PEDF II* and the plurality in *Robinson Township* extensively set forth that history, our rejection of the Commonwealth Court's approach requires discussion of factual and legal developments incidental to the narrow question presented on remand regarding the classification of certain revenue streams.

### Factual history

In 1955, the General Assembly established the Oil and Gas Lease Fund ("Lease Fund"), 71 P.S. § 1331, *repealed by*, Act 2017, Oct. 30, P.L. 725, which received "all rents

and royalties from oil and gas leases" executed on Commonwealth lands. These funds were exclusively dedicated to "conservation, recreation, dams, or flood control" or to match Federal grants for those same purposes, with a Commonwealth environmental agency given the discretion "to determine the need for and the location of any project authorized." *Former* 71 P.S. § 1332, *repealed by* Act 2017, Oct. 30, P.L. 725. In 1995, the Conservation and Natural Resources Act ("CNRA") was enacted and empowered the Department of Conservation and Natural Resources ("DCNR") to "make and execute contracts or leases" on behalf of the Commonwealth for mining or removing any minerals in State forests if the DCNR finds it is in the best interest of the Commonwealth. 71 P.S. § 1340.302(a)(6). The DCNR replaced the Department of Forests and Waters for purposes of the Lease Fund and the CNRA further altered the Lease Fund to specifically appropriate all moneys in it to the DCNR.

From its inception in 1955 through 2008, the Lease Fund received a total of $165 million. The flow of revenue into the Lease Fund increased dramatically starting in 2009, the year after the DCNR first leased a total of approximately 74,000 acres for Marcellus Shale drilling. That and subsequent leases generated approximately $600 million, comprised of four types of revenue streams: large one-time upfront bonus payments, annual rent fees paid by the acre, royalties based on the amount of marketable gas extracted, and interest penalties for late payments.

The DCNR self-imposed a moratorium on further leasing of Marcellus Shale lands pending further study and development of large tracts that had already been leased. However, the large amounts of money generated by the 2008 leases inspired the executive and legislative branches to pressure the DCNR to lease more land. To take

advantage of the expected revenues, the General Assembly inserted four new provisions into the Fiscal Code.

The most significant change was Section 1602-E, which stated that no Lease Fund royalty money, with an exception discussed next, should be expended unless appropriated or transferred to the general budgetary fund by the General Assembly. Thus, all the royalties in the Lease Fund would be transferred to a larger pool of money, whereupon the General Assembly would allocate back to the DCNR whatever amount it saw fit. This provision therefore overrode the "all moneys" language of the Lease Fund by restricting the formerly automatic appropriation of all Lease Fund royalty money to the DCNR. The exception was established within Section 1603-E, which annually earmarked up to $50 million in royalties to the DCNR but with the further direction that preference be given to operation and maintenance of State parks and forests (as opposed to the other uses listed in the Lease Fund).[4]

The Fiscal Code was also amended to transfer $60 million from the Lease Fund to the General Fund for fiscal year 2009-2010. 72 P.S. § 1604-E. A fourth provision transferred $180 million from the Lease Fund to the General Fund for fiscal year 2010-2011. 72 P.S. § 1605-E(a). These fiscal adjustments prompted DCNR to lift its moratorium and in January 2010 it leased approximately 32,000 acres plus an additional 33,000 acres in May 2010.

The legislative and executive branches took other steps that served to restrict the allocation of Lease Fund monies to the DCNR. These included using Lease Fund money

---

[4] This $50 million was not guaranteed, as the allocation was "subject to the availability of money" following other transfers. 72 P.S. § 1603-E.

to support the DCNR's overall budget – as opposed to using money from the General Fund to fund the DCNR – thereby reducing the amount of money available for conservation purposes. The legislature further specified that transfers from the Lease Fund to the DCNR from the General Fund were permissible only if the remaining balance was adequate to fund the DCNR. Additionally, Section 1605-E was amended to provide for $95 million from the Lease Fund to the General Fund for fiscal year 2014-2015. 72 P.S. § 1605-E(b). "Finally, the Supplemental General Appropriations Act of 2009 directed a transfer of $143 million from the Lease Fund to the General Fund." *PEDF II*, 161 A.3d at 922.

The General Assembly also created the Marcellus Legacy Fund, which supplied money for environmental projects not controlled by the DCNR, and was funded in part by annual appropriations from the Lease Fund. The Marcellus Legacy Fund's creation was one component of Act 13 of 2012, which "amended the Pennsylvania Lease Fund Act with substantial benefits to the natural gas industry in response to the Marcellus Shale boom." *Id.* at 930 n.21.

### Development of the law that the ERA creates a trust

The Act 13 legislation prompted various lawsuits, including the one that led to our decision in *Robinson Township*. The primary issue in that case focused on statutes imposing uniform zoning requirements across the Commonwealth, thereby overriding local municipalities' ability to regulate. Numerous petitioners asserted that these acts represented a breach of the Commonwealth's fiduciary duties imposed by the ERA.

Then-Chief Justice Castille, joined by Justice Todd and former Justice McCaffery, would have decided the case based on that theory. Chief Justice Castille authored an

opinion signaling, for the first time, that this Court would view the ERA as a constitutional right of the people, enforceable by the judiciary and not a merely aspirational policy statement. *Robinson Twp.*, 83 A.3d at 952. The plurality criticized the test set forth in *Payne v. Kassab,* 312 A.2d 86 (Pa. Commw. 1973) (en banc), which established three factors to apply when examining an ERA claim. *Id.* at 94. The plurality commented that the *Payne* test largely neutered the ERA's protections by limiting the viability of constitutional claims to cases in which "the General Assembly had acted and by the General Assembly's policy choices, rather than by the plain language of the amendment." *Robinson Twp.*, 83 A.3d at 966. It further noted that "the *Payne* test appear[ed] to have become, for the Commonwealth Court, the benchmark for Section 27 decisions in lieu of the constitutional text." *Id.*

Because *Robinson Township* did not garner a majority, *Payne* remained the benchmark in the *PEDF I* litigation. *See PEDF I*, 108 A.3d at 159 ("In the absence of a majority opinion from the Supreme Court or a decision from this Court overruling *Payne*[ ], that opinion is still binding precedent on this Court."). In its complaint, the PEDF sought relief under the fiduciary provisions of the Declaratory Judgment Act, 42 Pa.C.S. § 7535(2), challenging the 2009 through 2015 budget decisions. The PEDF raised over twenty issues and its prayer for relief sought fifteen separate declarations, which the Commonwealth Court reduced to three questions.

> (1) Whether Sections 1602–E and 1603–E of the Fiscal Code, which respectively provide that the General Assembly shall appropriate all royalty monies [of] the Lease Fund and that, subject to availability, up to $50 million of the Lease Fund royalties shall be appropriated to [the] DCNR, violate Article I, § 27;

> (2) Whether the General Assembly's transfers/appropriations from the Lease Fund violate Article I, § 27; and
>
> (3) Who within the Commonwealth has the duty and thus bears the responsibility to make determinations with respect to the leasing of State lands for oil and natural gas extraction.

*PEDF I*, 108 A.3d at 155.

Applying *Payne*, the Commonwealth Court held that Section 1602-E was not facially unconstitutional because although the DCNR was deprived of control over royalty monies, the General Assembly, as a Commonwealth entity, is bound to safeguard the Commonwealth's natural resources. Regarding the decision to allocate only $50 million of the royalty money to the DCNR, the intermediate appellate court redefined the challenge as whether the DCNR was adequately funded to achieve its mission and answered that framing in the affirmative. As to the remaining challenges to the budgetary decisions implicated by Sections 1604-E, 1605-E, and other similar transfers, the court held that the ERA "does not also expressly command that all revenues derived from the sale or leasing of the Commonwealth's natural resources must be funneled to those purposes and those purposes only." *Id.* at 168.

On appeal to this Court, both parties urged us to reject *Payne*. We unanimously agreed that the *Payne* test was incompatible with the ERA, thus "solidify[ing] the jurisprudential sea-change begun by Chief Justice Castille's plurality in *Robinson Township* [.]" *PEDF II*, 161 A.3d at 940 (Baer, J., concurring and dissenting). The lead opinion adopted the *Robinson Township* plurality framework, making clear that the plain text of the ERA controls and must be given the same effect as any other constitutional provision. Tracking *Robinson Township*'s plurality opinion, we held that the ERA contained three clauses which collectively advance "two primary goals, via prohibitory

and non-prohibitory clauses: (1) the constitutional provision ... prevent[s] the state from acting in certain ways, and (2) … establishes a nascent framework for the Commonwealth to participate affirmatively in the development and enforcement of these rights." *Robinson Twp.*, 83 A.3d at 950. Thus, a legal claim "may proceed upon alternative theories that either the government has infringed upon citizens' rights or the government has failed in its trustee obligations, or upon both theories, given that the two paradigms, while serving different purposes in the amendatory scheme, are also related and overlap to a significant degree." *Id.* at 950-51.

We further agreed with the *Robinson Township* plurality's explication of the three clauses in the ERA. The ERA "establishes two separate rights in the people," with the first being the declared environmental rights, namely "a right to clean air, pure water, and to preservation of the natural, scenic, historic and esthetic values of the environment." Pa. Const. art. I, § 27. This first right constitutes a limitation on the Commonwealth's power to act in degradation of those values. *Robinson Twp.*, 83 A.3d at 951. It does not deal with trust principles, whereas the second and third clauses do. The second clause establish the second right: specifically, "common ownership of the people, including future generations, of Pennsylvania's public natural resources." *Id.* at 954. The third clause "establishes the Commonwealth's duties" with respect to the commonly owned resources, with the natural resources as the corpus of the trust, the Commonwealth as the trustee, and the people as the named beneficiaries. The people are also the settlors and the terms of the trust must be construed according to their intentions. *Id.* at 956.

When ascertaining the settlors' intent, the *Robinson Township* plurality stated that the terms "'trust' and 'trustee' are terms of art that carried legal implications well

developed at Pennsylvania law at the time the amendment was adopted." *Id.* It cited numerous sources of materials that may bear on that inquiry, including case law applying trust principles, the Restatement (Second) of Trusts, the legislative history surrounding the ERA's enactment, and Pennsylvania's Uniform Trust Act. *See Robinson Twp.*, 83 A.3d at 959 n.45 (noting that the trust "is presumptively subject to the Uniform Trust Act"). Additionally, the Commonwealth, as trustee, is obligated "to comply with the terms of the trust and with standards governing a fiduciary's conduct," including the duties of prudence, loyalty, and impartiality. *Id.* at 957. The Commonwealth's obligations must be considered in light of the two rights created by the ERA. *Id.*

The adoption of private trust law principles by this Court in *PEDF II*, including imposing fiduciary duties as a component of the ERA analysis, prompted then-Justice, now-Chief Justice, Baer's concurring and dissenting opinion as well as then-Chief Justice Saylor's dissent. Then-Justice Baer agreed that the time had come to jettison *Payne* but favored imposing a public trust doctrine subject to a more flexible "fiduciary-like construct," *PEDF II*, 161 A.3d at 943 (Baer, C.J., concurring and dissenting). Justice Baer opined that "the focus of Section 27 is on the natural resources themselves, not the money gained from the resources. The trustee's duties are to 'conserve and maintain' the resources, not the money." *Id.* at 946-47 (Baer, C.J., concurring and dissenting). Additionally, Justice Baer agreed with the Commonwealth's analysis of the phrase "'benefit of all the people,' which includes both the enjoyment of the natural environment but also the utilization of the resources, without waste, for the current benefit of the public." *Id.* at 947. Justice Baer would have held that the proceeds generated "may be used for public purposes other than conservation," and where the Commonwealth provides

adequate funding to agencies to maintain and conserve the people's natural resources, "it is not required to take the illogical step of leaving substantial monies unused in a fund for the environment while being unable to meet other pressing needs of the people." *Id.* at 948. Then-Chief Justice, now Justice, Saylor dissented but "join[ed] the central analysis" of Justice Baer's opinion relating to the public trust doctrine. *Id.* at 949 (Saylor, C.J., dissenting).

### Application of trust law in *PEDF II*

Having established in *PEDF II* that the ERA created a trust subject to private trust law, we addressed the PEDF's challenges pursuant to those newly adopted principles. We rejected the Commonwealth's averment that revenues generated from the sale of trust assets may be redirected to general budgetary matters (i.e., non-trust purposes) on the theory that the ERA was silent on that point. We stated that argument was "plainly inaccurate, as Section 27 expressly creates a trust, and pursuant to Pennsylvania law in effect at the time of enactment, proceeds from the sale of trust assets are part of the corpus of the trust." *Id.* at 933.

Relatedly, the Commonwealth argued that the concluding phrase of the ERA, "for the benefit of all the people," conferred discretion upon the General Assembly to use Marcellus Shale revenues for any use that broadly benefited Pennsylvania citizens. *Id.* at 934. We disagreed, noting that the phrase "may not be read in isolation[.]" *Id.* "The Commonwealth's fiduciary duty to 'conserve and maintain' our public natural resources is a duty owed to the beneficiaries of the public trust[.]" *Id.* In context, the phrase "is unambiguous and clearly indicates that assets of the trust are to be used for conservation and maintenance purposes." *Id.* at 935.

We then held that royalty revenue streams must be returned to the trust. The critical feature of those revenue streams was their direct relation to the sale of trust assets. Under Pennsylvania trust law, "proceeds from the sale of trust assets are trust principal and remain part of the corpus of the trust." *Id.* For that proposition we cited *McKeown's Estate*, 106 A. 189 (Pa. 1919), a case reflecting that when trust assets are sold the proceeds are presumptively treated as principal. 106 A. at 190 ("Being a sale of assets in the corpus of the trust, presumptively all the proceeds are principal[.]"). "The unavoidable result is that proceeds from the sale of oil and gas from Section 27's public trust remain in the corpus of the trust." *PEDF II,* 161 A.3d at 933.

Because we held that royalties must be returned to the corpus, we determined that Sections 1602-E and 1603-E of the Fiscal Code, which related to royalties, were facially unconstitutional. We could not determine whether the same held true for Sections 1604-E and 1605-E, as well as Section 1912 of the Supplemental General Appropriations Act of 2009, all of which transferred money from the Lease Fund to the General Fund. The record lacked evidentiary support to decide whether these provisions were also unconstitutional, as those determinations could be made only after deciding how the other revenue streams (bonus payments, rents and interest penalties) must be treated under trust law. We cited *In re Rosenblum's Estate*, 328 A.2d 158 (Pa. 1974), and noted in a parenthetical explanation of the case that rents from realty have traditionally been treated as income payable to the trust's beneficiaries. As other possible sources of law on remand we cited, inter alia, 20 Pa.C.S. § 8145, a section of the Uniform Principal and Income Act.

### III. Remand Proceedings

On remand to the Commonwealth Court, the parties developed the record through further discovery and presented cross-applications for summary relief. Both staked out absolute positions, with each contending that **all** revenues must be directed to one purpose or another. The PEDF adhered to its view that all the revenues must be returned to the corpus of the trust as principal. "PEDF requests this Honorable Court to find and declare that all payments made under leases for the extraction and sale of oil and gas on State forest lands, including bonus and annual 'rental' payments, are part of the corpus[.]" Brief in Opposition to Commonwealth's Application for Summary Relief, 6/4/18, at 1. The Commonwealth disagreed, indicating that "[a]t this time, the singular remaining claim to be analyzed is whether payments other than royalty payments also constitute trust corpus," and contended that "the undisputed material facts show that these payments are not corpus of the trust." Brief in Opposition of PEDF's Application for Summary Relief, 7/9/18, at 2.

The Commonwealth argued that bonus and rent payments are not in exchange for severing the minerals because the government keeps those upfront payments regardless of whether the successful bidder develops the land. The Commonwealth, alluding to our statement in *PEDF II* that the trust retains the trust asset in its entirety after a rental period expires, 161 A.3d at 935 n.27, asserted that the bonus and rental payments convey a leasehold interest only with the bonus bid payments "made in exchange for obtaining that inchoate title," as opposed to in exchange for the actual extraction of gas. Commonwealth's Brief at 17. This argument was premised on the legal characterization of the different types of title that vests when a lessee leases mineral rights. Before drilling

can start, the lessee must confirm that the minerals can be extracted. In cases where the exploratory process does not result in a productive well, no actual estate vests and the lease terminates at the end of the primary term. In the Commonwealth's view, because the resources remain in the corpus, there is no depletion of trust assets and when it procures rentals and bonus payments in exchange for a mere inchoate leasehold interest, those revenues are not for the sale of trust assets and therefore may be used for other purposes. In support, it cited sixteen leases in which the Commonwealth kept over $124 million in bonuses and rental payments even though none resulted in a productive well. *See* Commonwealth's Brief at 16-19 (listing leases and amounts). The Commonwealth argued that those leases prove that payments can be made in which the trust assets were not depleted because no mineral estate ever vested.

The Commonwealth argued that it may generate revenues in this manner consistent with Pennsylvania statutory trust law that classifies rental payments as trust income, as opposed to trust principal.

> Pursuant to Pennsylvania trust law, rent from real or personal property is to be allocated as trust income, not trust principal. 20 Pa.C.S. § 8145(a). Further, only "refundable deposits" for rent "shall be applied to principal." 20 Pa.C.S. § 8145(b)(1). As neither the up-front bonus payment, nor the rent payments are refundable at the termination of the Department's leases, they are not "deposits" as defined by Pennsylvania trust law. They are therefore income rather than trust principal. Trust principal is defined as "[p]roperty held in trust for distribution to a remainder beneficiary when the trust terminates or property held in trust in perpetuity." 20 Pa.C.S. § 8102. Neither of these revenue streams are trust principal or corpus.
>
> Accordingly, the answer to the remaining question on remand is that the true purpose of the bonus-bid and rental payments is an inchoate leasehold interest in the State forest land. They are not the conversion of a trust asset from one form to another. Rather, they are income, as they do not dispose of

> or deprive the trust of any further benefit from the trust asset. *See In re Rosenblum's Estate*, 328 A.2d 158, 163 (Pa. 1974) (holding that rents from realty, unrelated to oil and gas leases, have traditionally been treated as income (and payable directly to the trust's beneficiaries) rather than principal).

Commonwealth's Brief at 15-16; *accord PEDF II*, 161 A.3d at 935 (citing 20 Pa.C.S. § 8145).

Section 8145 is codified within the Pennsylvania Uniform Principal and Income Act, 20 Pa.C.S. §§ 8101-8191, which was enacted in 2002. The Commonwealth viewed Section 8145 as establishing that an inchoate leasehold interest is equivalent to a rental and therefore the associated bonuses, rents, and late fees revenue streams could be used for non-trust purposes because "they do not dispose of or deprive the trust of any further benefit from the trust asset." Commonwealth's Brief at 19.

The PEDF, in contrast, characterized the bonus payments as inextricably linked to the actual sale of gas and therefore constituted the sale of trust assets. *See* Amendment to Application for Summary Relief, 7/13/2017, at unnumbered 3 ("[B]onus payments for oil and gas development are … a cost directly related to the sale of the natural gas. … DCNR does not consider leasing of our forests as rent, similar to renting a pavilion or a cabin."). The PEDF maintained that the leases themselves, read in tandem with case law involving analysis of contractual consideration principles, confirmed that these payments must be construed as consideration for the sale of trust assets which must be returned to the trust. The leases, in PEDF's view, "clearly defined" the purpose of bonus and rental payments. Bonus and rental payments are therefore "express consideration paid by lessees for the right to enter upon our State forests to extract and remove the oil and gas." PEDF's Brief at 9 (emphasis omitted).

Responding to the Commonwealth's theory that only an inchoate leasehold interest was conveyed via the bonus and rental payments, the PEDF submitted that the argument is flawed because it "arbitrarily bifurcates the activities necessary to remove oil and gas from the sale itself and is not supported by law, which recognizes an agreement to remove and sell all the oil and gas on a parcel of land is the agreement to convey fee title of the oil and gas that is part of the real estate." PEDF's Brief in Opposition to Summary Relief, 6/4/2018, at 15. It cited this Court's observation in *In re Bruner's Will*, 70 A.2d 222 (Pa. 1950), that bonus payments are considered inseparable from the sale of mineral rights as a matter of law. *See id.* at 225 ("In reality, the lease contemplates removal of all the oil and is in effect a sale, with payment to be made as the mineral is removed. Obviously, it was a sale of part of the principle [sic] of the trust and properly the moneys received therefrom belonged to the corpus.").

Additionally, the PEDF challenged the application of 20 Pa.C.S. § 8145. It conceded that the statute "does allow a certain portion of receipts from an interest in minerals to be allocated to income when an income beneficiary exists," but argued that "Section 27 does not establish any income beneficiary, so an allocation of any receipts to income would not be consistent with the express terms of the trust created." PEDF's Brief in Opposition to Summary Relief, 6/4/2018, at 24. The PEDF argued that "[t]he plain language of Section 27 controls how the Section 27 trust must be used and the Supreme Court in *PEDF II* has recognized the sole purpose of the trust is to conserve and maintain public natural resources." *Id.* at 24-25.

## The Commonwealth Court's decision

The Commonwealth Court rejected the arguments of both parties. According to the Commonwealth Court, incomes generated from the oil and gas leases are subject to the 1947 Act (which was the law when the ERA was adopted) based on its conclusion that the ERA recognized two distinct classes of beneficiaries. *PEDF III*, 214 A.3d at 761. This conclusion was based on a cursory analysis of the ERA's text.

> [T]he trust instrument here is Section 27; the trust property is Pennsylvania's public natural resources; the Commonwealth is the trustee; and the people of Pennsylvania – both current and future generations – are the beneficiaries. Pennsylvanians have both a present and future interest in the trust. In essence, today's generation represents life tenants or life beneficiaries of the trust and tomorrow's generation represents the remainder interest.

*Id.* at 761 (citation omitted).

The foregoing is the totality of its constitutional analysis. The Commonwealth Court candidly acknowledged that it manufactured this framework by way of analogy to cases cited by the PEDF that dealt with present and future rights in minerals. *Id.* In its view, those who hold a present right in minerals, represented by the current generation of Pennsylvanians, and the holder of the remainder interest, represented by the future generations, are each entitled to a share of the proceeds generated from the sale of trust assets. *Id.* With no explanation as to how those purported distinct classes of beneficiaries could benefit in different ways, the Commonwealth Court reasoned that the ERA "did not specify the method for allocating receipts." *Id.* at 768. Contrary to our holding in *PEDF II* that trust assets are to be used for conservation and maintenance, this analogy led the court to conclude that the ERA could be construed to "allow[ ] today's generation of Pennsylvanians to benefit in other ways from the revenue produced." *Id.* at 774. This is

a successive beneficiary framework. *See* RESTATEMENT (SECOND) OF TRUSTS § 232 ("If a trust is created for beneficiaries in succession, the trustee is under a duty to the successive beneficiaries to act with due regard to their respective interests.").

In lieu of grounding its life tenants and remaindermen framework in the actual text of the ERA, the Commonwealth Court's analysis emphasized the difficulties inherent in the determination of what legal interests are conveyed in mineral lease contracts, which the court recognized are "unique and 'far from the simplest of property concepts.'" *Id.* at 758 (quoting *Brown v. Haight*, 255 A.2d 508, 510 (Pa. 1969)). The landowner/lessor has three distinct interests in leased land: "(1) a possessory interest in the surface except insofar as it may interfere with drilling operations; (2) a right to receive bonus, rentals and royalties under the lease; and (3) the possibility of reverter in the minerals in place." *Id.* (quoting Robert E. Sullivan, *Handbook of Oil and Gas Law* 69 (1955)).

The different types of legal title acquired by a mineral lessee tied into the Commonwealth's argument that the purpose of the bonus and rental payments was to convey only an inchoate leasehold. The Commonwealth Court noted that Pennsylvania case law initially classified the lessee's interest as an "incorporeal hereditament, not a conveyance of title[,]" *id.* (citation omitted), but since the early 20th century cases have "consistently held that the title conveyed in an oil and gas lease is inchoate, and is initially for the purpose of exploration and development." *Id.* (collecting cases). But no matter how the lessee's interest is classified, the Commonwealth Court observed that "the general purpose of an oil and gas lease is to secure the right to explore and develop the property with the expectation of receiving large returns from the royalties payable on production." *Id.* at 759. Once minerals are removed from the property, the lessee's

interest becomes vested as a fee simple determinable estate. In the event minerals are not extracted, no estate ever vests. *Id.* (citations omitted).

Next, the Commonwealth Court discussed the issue of contractual consideration in generic terms and distinguished rentals from bonuses. Rents "refer[] to the consideration paid to the lessor for the privilege of delaying drilling operations" and typically "do not depend on the discovery or production of oil and gas, but rather represent compensation for the time to explore." *Id.* (citations omitted). Regarding bonus payments, the court noted that the term can refer to different things and cited various cases in which "bonus provisions … have served different purposes." *Id.* For example, in some cases the bonus amounts were not based on actual production, whereas in other situations they were; sometimes, bonus payments were split with one part of the bonus linked to the right to occupy and explore the land while the remaining part was tied to actual production. And, finally, "[b]onuses have also been used as part of a competitive bidding process in securing oil and gas leases." *Id.* at 760.

Having established these background principles, the Commonwealth Court determined that the relevant question is "whether rents and bonuses ... constitute income or principal pursuant to Pennsylvania trust principles in effect" when the ERA was enacted, a question that the Commonwealth Court recognized "is a complex one." *Id.* A complicating factor is that the foregoing cases discussing bonuses and rents were not necessarily trust cases. In the footnote appended to that observation, the panel noted that absent a special trust provision or statute, "the allocation among beneficiaries of proceeds from oil and gas leases follows the division of proceeds between the owner of a legal life estate and the owner of the complementary future interest" depending upon

application of common law doctrines. *Id.* at 760 n.14. The court also noted "a split of authority as to whether a bonus paid for an oil and gas lease is income or principal to be conserved for the remainder beneficiary." *Id.* (citations omitted).

The Commonwealth Court then "reexamine[d] the intent embodied in Section 27 to determine whether Section 9 of the 1947 Act applies." *PEDF III*, 214 A.3d at 768. In its "re-examination," when analyzing the settlors' intent, instead of applying the holding as expressed in the Majority Opinion, the panel drew on then-Justice, now Chief Justice, Baer's concurring and dissenting opinion in *PEDF II* and concluded that the settlors "contemplate[d] the 'continued, but judicious, use of the resources.'" *Id.* (quoting *PEDF II*, 161 A.3d at 947 (Baer, J., concurring and dissenting)).[5] The Commonwealth Court then concluded that the ERA's silence on the method for disposing of net proceeds required the application of the 1947 Act's apportionment methodology:

> Although Section 27 expressed the intent to conserve and maintain the corpus – public natural resources – for the benefit of all the people, it made no provision for the disposition of the net proceeds obtained from the use thereof. In other words, it did not specify the method for allocating receipts. Though Section 27's intent was clear, the directions for administration of the trust were not expressly delineated. Consequently, Section 9 of the 1947 Act governs the ascertainment of income and principal and the apportionment of proceeds between income and principal. *See former* 20 P.S. §§ 3470.2, 3470.9.

*PEDF III,* 214 A.3d at 768.

The final question was whether the bonus, rental payments, and late fees were in consideration for the sale of trust assets. The Commonwealth Court concluded that the

---

[5] We recognize that now-Chief Justice Baer continues to maintain the views expressed in his *PEDF II* opinion. *See* Dissenting Op. (Baer, C.J.).

bonuses, rentals and late fees were in consideration for a leasehold interest only, and thus, subject to an accounting, the 1947 Act's proceed-splitting provisions applied.[6]

## IV. Parties' Arguments

### The PEDF

The PEDF challenges the notion that Article I, Section 27 created life tenants and remaindermen, arguing that this was an artificial construct. The PEDF asserts that "the Commonwealth Court started from the belief that Article I, § 27 authorizes the sale of trust assets to generate income" and challenges this premise. PEDF's Brief at 32. The PEDF further alleges that the Commonwealth Court reasoned backwards, pointing to the court's statement that "[t]he 1947 Act's allocation of proceeds to principal and income reflects an equitable balance between the needs of present and future generations of Pennsylvanians," *PEDF III*, 214 A.3d at 774, as an indicator that the panel strived to achieve a pragmatic result instead of strictly applying our directions on remand.

The PEDF contends that the Commonwealth Court's identification of life tenant beneficiaries and remaindermen within Article I, Section 27 is without any textual foundation. The Commonwealth Court did not view the revenues as constituting a sale of trust assets in part because of a split of authority regarding how to allocate those revenues between life tenants and remaindermen, *id.* at 760 n.14, which involved application of common law doctrines that exclusively favored one group or the other depending on a combination of facts involving whether mines were opened during the

---

[6] "However, an accounting is necessary to ensure that only one-third of the proceeds allocable to income are removed from the Lease Fund for non-conservation purposes and that the funds designated as principal are ultimately used in accordance with the trustee's obligation to conserve and maintain our natural resources." *PEDF III*, 214 A.3d at 774.

testator's lifetime and whether the relevant instrument granted powers to lease mineral rights. However, statutes like the 1947 Act served to statutorily abolish those common law doctrines. In the Commonwealth Court's view, the abolishment of those doctrines necessitated its analogy to life tenants and remaindermen to coherently apply the mineral rights cases in tandem with private trust principles as ordered by this Court. The PEDF challenges that premise.

> [T]he Commonwealth Court started from the belief that Article I, § 27 authorizes the sale of trust assets to generate income. From that assumption, the Court determined that the Principle [sic] and Income Act of 1947 should be applied to define how bonus and annual rental payments should be allocated. From there, the Court concluded that one third of the upfront bonus and annual rental payments is income that can be transferred to the General Fund.

PEDF's Brief at 32 (citations omitted).

Relatedly, the PEDF also faults the Commonwealth Court's analysis of the lease language. PEDF reiterates its argument that the language of the leases themselves specifically state that their sole purpose was to sever the minerals from the land. "[DCNR] does hereby grant, demise, lease, and let, exclusively unto Lessee for the purposes only of exploring, drilling, operating, producing, and removing of oil, gas and liquid hydrocarbons ... ." *PEDF III*, 214 A.3d at 771 (quoting leases). The Commonwealth Court determined that the bonuses and rents were only in consideration of securing the lease, and therefore the lease granted only an inchoate leasehold that does not vest until minerals are extracted. The PEDF argues that this conclusion is sound only to the extent that the contractual language regarding "removing of oil, gas and liquid hydrocarbons" may be ignored. The PEDF argues, as a matter of law, the plain language of the contract establishes that the parties intended for the payments to be in consideration for removing

minerals. Therefore, the Commonwealth Court erroneously concluded that the "true purpose" was for something other than sale of minerals, which would plainly qualify as sale of trust proceeds that must all be returned to the corpus under *PEDF II* without any need to apply the 1947 Act.

### The Commonwealth

The Commonwealth has abandoned its absolutist position advanced in the Commonwealth Court as well as its reliance on the modern principal and income act, and now agrees that Section 9 of the 1947 Act controls.[7] It further agrees with the Commonwealth Court's analysis of that statute's application.

Additionally, the government maintains its focus on the fact that bonus and lease payments are retained even if the tract is unproductive. In the Commonwealth's view, the sixteen leases in which it received approximately $140 million dollars despite the fact minerals were not removed establishes the correctness of the Commonwealth Court conclusion that those payments were in consideration for only an inchoate leasehold and not in consideration for the sale of trust assets. Unlike royalty payments, which are tied directly to the extraction of oil and gas from State forests and game lands as compensation for the severance of that asset from the Section 27 trust, bonus bid payments and rental payments are made purely to secure the lease and for the lessee's ability to explore and develop the property in anticipation of extraction. They are,

---

[7] The Commonwealth Court applied the 1947 Act because it was the law in place at the time of the ERA's enactment, and it further recognized that retroactive application of statutes to trusts may be unlawful. *See PEDF III,* 214 A.3d at 767 n.24. In contrast, we note that a section of the modern principal and income act, 20 Pa.C.S. § 8191, states that its provisions apply to trusts "existing on or after the effective date of this act." Act 2002, May 16, 2002, P.L. 330. Because of our resolution, we need not resolve which version would apply.

therefore, not proceeds received as consideration for severance of a trust asset and are income that need not remain in the trust corpus.

## V. Analysis

The first question presented on remand was how to classify the revenue streams from bonuses, rentals and penalty interest. If these revenue streams were for the "true purpose" of selling trust assets, then those streams are indistinguishable from royalties and must remain in the trust corpus and no further analysis would be required. We thus begin our analysis with the appropriate classification of the revenue streams.

### Bonus payments

The parties agree that the analysis of bonus payments turns, in large part, on contractual law. A lease "is in the nature of a contract and is controlled by principles of contract law." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012). The fundamental rule of contract interpretation is to give effect to the parties' intent in accordance with the contract's terms. *See, e.g.*, *Hagarty v. William Akers, Jr. Co.*, 20 A.2d 317 (Pa. 1941) ("[I]t is not the function of this Court to re-write it, or to give it a construction in conflict with that which accords with the accepted and plain meaning of the language used."); *Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P.*, 217 A.3d 1227, 1238 (Pa. 2019) (quoting *Amoco Oil Co. v. Snyder*, 478 A.2d 795, 798 (Pa. 1984)). The meaning of an unambiguous contract is a question of law for which our review is de novo. *Lesko*, 15 A.3d at 341-42. Additionally, "custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract." *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001). Where a term has a

special meaning or usage in the industry, "members of that industry are presumed to use the words in that special way," regardless of any apparent ambiguity. *Id.*

An exemplar contract[8] states that the lease resulted from a "[c]ompetitive, sealed bid submission received by Department on or before September 3, 2008, and with bids submitted pursuant to such advertising," with the lessee "be[ing] the highest responsible bidder." The lease further states that it was executed "in consideration of the sum of TWELVE MILLION TWO HUNDRED EIGHTY-SEVEN THOUSAND TWO HUNDRED THIRTY-NINE DOLLARS ($12,287,239.00) paid by Lessee to Department[.]" The clause continues that the lease "does hereby grant, demise, lease, and let, exclusively unto Lessee for the purposes only of exploring, drilling, operating, producing, and removing of oil, gas and liquid hydrocarbons" on the applicable tracts as defined by the lease. R.R. Vol. 1 at 24.

The lease is for a term of ten years, with a requirement that the lessee construct a well within the first five years. The lease continues from year-to-year thereafter and may be extended beyond the initial ten-year period. The lessee owes annual rental payments to the Commonwealth, payable by the acre. The contract refers to the upfront payment as the "bonus payment" or the "competitive sealed bid." *Id.* at 25. The lessee "must operate each well with a discrete well meter at the well site, which will measure all the gas produced from that well." *Id.* at 26. Royalties are paid to the Commonwealth based on the marketable gas that is extracted.

---

[8] PEDF attached full copies of the leases to its Amended Application for Relief. According to the parties, the leases identified as exhibits are representative of the Commonwealth leases involved in the respective lease sales. *PEDF III*, 214 A.3d at 770.

The parties frame their arguments in terms of contractual consideration. *See, e.g.*, PEDF's Brief at 17 ("The bonus and rental payments are the express consideration paid for the right to enter upon the State Forest to extract and remove the oil and natural gas so that it can be purchased."); Commonwealth's Brief at 13-14 ("These up-front, bonus bid payments are not consideration for oil and gas that is extracted from the land."). "Consideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Stelmack v. Glen Alden Coal Co.*, 14 A.2d 127, 128 (Pa. 1940) (quoting *Hillcrest Found., Inc. v. McFeaters*, 2 A.2d 775, 778 (Pa. 1938)). Our courts have recognized that the precise nature of the legal interest conveyed to a lessee in a mineral lease resists easy characterization. *See, e.g.*, *Sabella v. Appalachian Dev. Corp.*, 103 A.3d 83, 101 n.8 (Pa. Super. 2014) (recognizing that the characterization of the legal interest conveyed in a mineral estate has historically been described in a multitude of ways, some of which are contradictory).

As the Commonwealth Court explained, the parties submitted evidence on the purpose of bonus payments in the oil and gas industry to shed light on what its "true purpose" was. The court remarked that "[t]he word 'bonus' has a definite meaning in the oil and gas industry. It is defined ... as a premium paid to a grantor or vendor, and strictly in the cash consideration or down payment paid or agreed to be paid for the execution of an oil and gas lease." *PEDF III*, 214 A.3d at 759 (quoting Robert E. Sullivan, *Handbook of Oil and Gas Law* 69 at 126 n.9 (1955)).

On that point, there is no question that the bonuses were the primary, if not exclusive, factor used to determine the recipient of the lease. John H. Quigley, who

served in a variety of executive positions with the DCNR from February of 2005 through January of 2011, submitted an affidavit stating:

> The bonus bid was designed to reflect the partial or potential value of the natural gas that would be extracted. The competitive "bonus bid" component of the process was the basis upon which DCNR awarded the leases … for the purpose of extracting the publicly-owned natural gas resources.

Affidavit of John H. Quigley, R.R. Vol. 1 at 5.

As previously noted, the Commonwealth executed eighteen leases in early 2009, awarded based on "[thirty-nine] bids from seven different pre-qualified bidders." R.R. Vol. 1 at 9. The leases were awarded to five different bidders[9] and encompassed slightly over 74,000 acres. The Commonwealth received upfront bonus payments totaling $189,786,688.18 for these eighteen leases. The bonus payments varied depending on the tracts at issue. While other variables may be at play regarding the variation in price, we accept that the upfront bonus bid reflects, in part, the expected profitability of the extracted oil and gas. But this does not establish that the "true purpose" of the bonus is to purchase whatever is ultimately extracted, as the Commonwealth keeps the bonus money regardless of whether the lessees' hope becomes a reality.

The PEDF's argument that the true purpose of the bonus payments must be for the sale of trust assets draws heavily on the fact that the contract lists its purposes as including "removing of oil, gas and liquid hydrocarbons[.]" There is no doubt that the "true purpose" of the lease was to ultimately extract oil and gas. The record evidence, however, establishes that the Commonwealth kept significant sums of money even in cases where

_____

[9] Seneca Resources, Anadarko E&P, ExxonMobil, Fortuna Energy, and Hunt Oil.

nothing was extracted. To hold that the true purpose of bonus payments was for the sale of trust assets requires that we ignore that fact. Additionally, there is no evidence to suggest that the bonus payment was an upfront payment of royalties as opposed to a means to differentiate the various bidders.

We thus agree with the Commonwealth Court that the title conveyed in the leases were inchoate, initially for the purpose of exploration and development with title vesting only after minerals are removed. The PEDF's "plain language" interpretation of the contractual language focuses exclusively on what happens after the exploratory and development processes succeed. However, this ignores that those activities are substantial and costly. As Mr. Quigley stated, "Those activities involved clearing land and converting it from public forest to industrialized, private use. Extraction activities included the construction of well pads, pipelines, compressor stations, roads, staging areas, impoundments, and all other infrastructure required for the extraction and production of natural gas." Affidavit of John H. Quigley, R.R. Vol. 1 at 5. The right to conduct these activities is, in part, in exchange for the consideration paid in the form of the upfront bonus bid.[10]

Furthermore, the parties presented evidence regarding industrial practices surrounding mineral leases. The Commonwealth Court noted that Daniel Devlin, the

---

[10] The PEDF relies heavily on the observation *In re Bruner's Will* that "In reality, the lease contemplates removal of all the oil and is in effect a sale, with payment to be made as the mineral is removed. Obviously, it was a sale of part of the principle of the trust and properly the moneys received therefrom belonged to the corpus." *In re Bruner's Will*, 70 A.2d 222, 225 (Pa. 1950). While the lease in question remained in force so long as oil or gas was produced or the lessee commenced drilling a well with reasonable diligence, the case does not clearly indicate what happened to the bonus payment if those conditions were not met. Thus, *Bruner's Will* is not dispositive of the case and leases presented here.

Director of the Bureau of Forestry, testified by deposition and explained that oil and gas companies can "nominate" lands and ask the DCNR to put them up for bid. *PEDF III*, 214 A.3d at 772. DCNR then "advertises the tract in multiple outlets with bidding instructions," and generally requires sealed bids. In this respect, Mr. Devlin explained that "it's our fiduciary responsibility to get the best value for the tract of land possible." *Id.* (quoting deposition). The bonus payment therefore represents a gamble on the part of the lessee. While the amount of the bonus bid is no doubt tied to the expected profitability of the tract, the fact is that the industry practice is to solicit the highest bid upfront. Indeed, as Mr. Devlin alluded to, a failure to follow this practice would pose its own set of problems. The record establishes that sixteen leases have been terminated for non-production, with the DCNR retaining a total of over $124,000,000 in bonuses and rentals. *See id.* ("DCNR received and retained a total of $120,479,684 in bonus payments and $3,528,630 in rental payments, without any gas or oil removed.") Had the Commonwealth not followed industry practices, these monies would never be received, thus subjecting the Commonwealth to a charge that it violated its duties as trustee by failing to follow the industrial practice of soliciting bonus bids upfront. *See In re Warfel's Estate*, 209 A.2d 293, 295 (Pa. 1965) ("The duty of a fiduciary to obtain for his or its estate the most advantageous price is a duty owing to the estate and the beneficiaries thereof[.]") (quotation marks and citation omitted). For these reasons, we conclude that the bonus bids are not subject to the same treatment as royalties and are properly classifiable as income.

**Rentals and late fees**

The only sum paid upfront in exchange for the lease is the bonus payment. As we have found that sum is not for the sale of trust assets, it naturally follows that rentals and late fees would likewise not qualify. We briefly discuss additional reasons why that is the case.

The exemplar contract specified that the first year's rental payment was the bonus payment. R.R. Vol 1 at 25. Rentals for the second, third, and fourth years were set at $20 per acre per year, payable on the anniversary date of the lease. For the remaining years, the rent increased to $35 per acre per year. *Id.* These payments were not fixed, however, as the price was reduced based on the number of productive wells. Each well drilled within the leased premises "shall reduce the rental set out in the preceding paragraph by the amount of rental on the number of acres attributable to each well … which reduction shall become effective on the next rental date, provided the well is producing in paying quantities." *Id.* Additionally, if there is a well capable of producing gas and was not productive, the lessee "shall pay Department at the expiration of each said year for that year a rental payment for each such well at the full rental rate per acre for the 'acreage attributable to the well', as referred to in Section 21 ("Subsequent Wells") of the lease." *Id.* Regarding late fees, the lessee "agrees to pay an additional twelve percent (12%) annual interest on the defaulted amount calculated from the time of such default." *Id.* at 27.[11]

---

[11] Because late fees are payable based solely on failures to make timely payments as called for by the lease agreement, rental payments and the late fees are treated alike in our analysis.

These rental payments and late fees have no bearing on the execution of the lease itself. They are obligations that are payable even if wells on the acreage are not productive. Rental obligations are paid based on the passage of time, while the late fees are triggered only if the lessee fails to timely make payments to the lessor. Because both revenue streams are generated even if no oil or gas is extracted, they, like the bonus payments, are not received in exchange for the purchase of trust assets. Consequently, those payments are properly classified, in trust terms,[12] as income.

Having determined these revenues are appropriately classified as income streams, the remaining question becomes whether, while not qualifying as the sale of trust assets, these funds may be diverted to non-trust purposes – as the Commonwealth Court held. We conclude that the answer is no. A fuller examination of the ERA's text in light of our previous analysis in *PEDF II* in conjunction with application of trust principles illustrates that the Commonwealth Court's identification of successive beneficiaries possessing income entitlements is without any foundation.

Where the trust beneficiaries are entitled to income, the appropriate distribution of that income is a duty of the trustee. *See* 20 Pa.C.S. § 8131(a) ("An income beneficiary is entitled to net income from the date on which the income interest begins."). *See*

---

[12] The parties and the Commonwealth Court did not distinguish between principles of trust law pertaining to private charitable versus noncharitable trusts. The ERA is an express trust presumptively subject to the Uniform Trust Act, *see PEDF II*, 161 A.3d at 932-33, and that act applies to both charitable and noncharitable trusts. *See* 20 Pa.C.S. § 7702 ("This chapter applies to express trusts, charitable and noncharitable[.]") "The great majority of the [statute]'s provisions apply to both charitable and noncharitable trusts without distinction." 20 Pa.C.S. § 7703, cmt. Thus, the interpretive tools applicable to both types of trusts are largely the same. We address the issues as the parties and the Commonwealth Court did without distinction between private charitable versus noncharitable trusts.

RESTATEMENT (SECOND) OF TRUSTS § 182 ("Where a trust is created to pay the income to a beneficiary for a designated period, the trustee is under a duty to the beneficiary to pay to him at reasonable intervals the net income of the trust property.")[13]  How to distribute income is a question dictated by the trust instrument.  *See id.* cmt c ("By the terms of the trust the trustee may be authorized or directed to accumulate the whole or a part of the income."); *id.* ("To the extent to which the trustee by the terms of the trust has discretion to withhold the income from the beneficiary, he is not under a duty to pay it to the beneficiary."); *accord* 20 Pa.C.S. § 8103(a)(1) ("A fiduciary shall administer a trust or estate in accordance with the governing instrument[.]").  For example, Section 9 of the 1947 Act offers the mechanism for the trustee to follow when allocating incomes between life tenants and remaindermen, i.e., successive beneficiaries, in the absence of a trust provision addressing that point.  Section 9 of the 1947 Act requires both an income entitlement and the absence of a trust provision instructing the trustee how to distribute income to successive beneficiaries.  *See former* 20 P.S. § 3470.1 (defining "tenant" as "the person to whom income is presently or currently payable, or for whom it is accumulated, or who is entitled to the beneficial use of the principal presently and for a time prior to its distribution."); *former* 20 P.S. § 3470.9 (directing that the proceed splitting provisions apply if "no provision is made for the disposition of the net proceeds thereof[.]").  Thus, the Commonwealth Court correctly concluded that the 1947 Act is designed to

---

[13] In *PEDF II*, we agreed with the *Robinson Township* plurality that the ERA is an express trust presumptively subject to the Uniform Trust Act.  *See* supra note 12.  As in *Robinson Township* and *PEDF II*, we cite the Restatement (Second) of Trusts for general illustrations of trust law principles.

address the conflict involved when dealing with successive beneficiaries.[14]  *See PEDF III*, 214 A.3d at 774 (describing the 1947 Act's provisions as "reflect[ing] an equitable balance between the needs of present and future generations of Pennsylvanians").

But the foregoing principles apply only when the trust creates successive beneficiaries and income entitlements.  The ERA does neither.  "[W]hen reviewing challenges to the constitutionality of Commonwealth actions under Section 27, the proper standard of judicial review lies in the text of Article I, Section 27 as well as the underlying principles of Pennsylvania private trust law in effect at the time of its enactment.  *PEDF II*, 161 A.3d at 930.  "In construing a constitutional provision, as when construing a statute, this Court begins with the plain language."  *Jubelirer v. Rendell*, 953 A.2d 514, 525 n.12 (Pa. 2008).  The Commonwealth Court assumed, with no elaboration, that the ERA created life estates for the benefit of current Pennsylvania citizens, followed by successive beneficiaries in the form of future generations of Pennsylvanians as the remaindermen.  We agree with the PEDF that "[n]othing in the plain language of Article I, § 27 can be reasonably construed as authority to treat 'today's generation' of Pennsylvanians as life tenants entitled to income from the Section 27 trust assets." PEDF's Brief at 37.  There are two critical trust concepts underlying that point: whether the beneficiaries' interests are simultaneous or successive, and whether the ERA created income entitlements.[15]

---

[14]  A life tenant entitled to income from the sale of mineral assets has a motive to extract and sell as many of the minerals as possible, which necessarily comes at the expense of the remaindermen since those assets obviously cannot be again sold.

[15] While we apply trust principles to answer these questions we must keep in mind, as the *Robinson Township* plurality stated, that those principles must be considered

## Trust entitlements and successive versus simultaneous beneficiaries

The two clauses of Article I, Section 27 creating the trust provide: "Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people." Pa. Const. art. I, § 27. The named beneficiaries are "all the people, including generations yet to come." The text does not distinguish between "current Pennsylvanians" and future generations. Instead, generations yet to come are **included** within the broadly defined beneficiary: "all the people." The unity of interest of current Pennsylvanians and generations of Pennsylvanians yet to come is evident from the structure of the trust. The first clause vests the public natural resources as common property of "all the people" including generations yet to come. The second clause, delineating the purpose of the trust reverts to the use of the phrase "all the people" making clear that the conservation and maintenance of the public natural resources is not temporally limited. The first clause can only be read to clarify the breadth of the phrase "all the people" and in no way

---

alongside the fact that the ERA, unlike virtually any other trust, has a constitutional dimension.

> Although the Environmental Rights Amendment creates an express trust that is presumptively subject to the Uniform Trust Act, the ultimate power and authority to interpret the constitutional command regarding the purposes and obligations of the public trust created by Section 27 rests with the Judiciary, and in particular with this Court.

*Robinson Twp.*, 83 A.3d at 959 n.45 (quotation marks and citations omitted).

distinguishes between the generations. In trust terms, this means that the beneficiaries are simultaneous in nature as opposed to successive.

In this respect, we agree with the *Robinson Township* Court's view that the ERA contains a "cross-generational dimension [that] reinforces the conservation imperative: **future generations are among the beneficiaries** entitled to equal access and distribution of the resources, thus, the trustee cannot be shortsighted." *Robinson Twp.*, 83 A.3d at 959 (emphasis added).[16] Interpreting the ERA to encompass a "cross-generational dimension" reflects that the beneficiaries' interests are the same across that divide: the conservation and maintenance of the public natural resources. Far from setting up any kind of conflict between these beneficiaries regarding profiting from trust assets, the express inclusion of generations yet to come in "all of the people" establishes that current and future Pennsylvanians stand on equal footing and have identical interests in the environmental values broadly protected by the ERA. *See also PEDF II*, 161 A.3d at 931 ("The second right reserved by Section 27 ... is the common ownership by the people, including future generations, of Pennsylvania's public natural resources.").

The language unmistakably conveys to the Commonwealth that when it acts as a trustee it must consider an incredibly long timeline and cannot prioritize the needs of the living over those yet to be born. The explicit inclusion as simultaneous beneficiaries of the future generations of Pennsylvanians creates a cross-generational dimension and reminds the Commonwealth that it may not succumb to "the inevitable bias toward present consumption of public resources by the current generation, reinforced by a

---

[16] The *Robinson Township* plurality noted that inclusion of generations yet to come as beneficiaries may be superfluous. *Robinson Twp.*, 83 A.3d at 959 (citing 1970 Pa. Legislative Journal–House at 2273 (analysis of Professor Broughton)).

political process characterized by limited terms of office." *Robinson Twp.*, 83 A.3d at 959 n.46.

### The ERA does not create income entitlements

Having established that the ERA created simultaneous beneficiaries with equal interests in the trust's management, there is no foundation for the allocation of income to life tenants since there are none. The appropriate disposition of income generated by these leases is also determined by the language of the ERA Trust.[17]

---

[17] The Commonwealth Court's analysis assumed that its task was to determine **how** to divide income and not **whether** income may be used for any non-trust purposes, such as the General Fund expenditures that prompted this suit. In this respect, the Commonwealth Court was plainly influenced by the minority opinion authored by our learned colleague Chief Justice Baer, which expressed the view that the settlors contemplated the continued and judicious use of the resources and that "income generated by the assets … would not be deemed part of the corpus of the trust under private trust principles." *PEDF II*, 161 A.3d at 947 and 941 n.3 (Baer, C.J., concurring and dissenting). Based on its preference for the dissenting posture, the Commonwealth Court "reexamine[d] the intent embodied in Section 27 to determine whether Section 9 of the 1947 Act applies." *PEDF III*, 214 A.3d at 768. This inverts the analysis. The proper question is whether the settlors created life tenants and remaindermen with an income entitlement.

Finally, although concluding that the 1947 Act applied, neither the Commonwealth nor the Commonwealth Court addressed how the Commonwealth as trustee could follow the statute consistently with its trustee obligations. In particular, we agree with the PEDF that this raises the specter of self-dealing. A trustee "is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." RESTATEMENT (SECOND) OF TRUSTS § 170 (1959). A comment to this section states:

> *Bonus, commission or other compensation.* The trustee violates his duty to the beneficiary if he accepts for himself from a third person any bonus or commission for any act done by him in connection with the administration of the trust. Thus, if he sells trust property and accepts from the purchaser a bonus for making the sale, he commits a breach of trust.

RESTATEMENT (SECOND) OF TRUSTS § 170, cmt. o. Accepting a bonus payment to advance a non-trust purpose would benefit the Commonwealth, not the beneficiaries. *See* infra note 19.

Pursuant to the terms of the trust, these incomes must be returned to the corpus of the trust. This conclusion is based on the absence in the trust of language creating any entitlement in the beneficiaries to receive trust income in the form of what is essentially a cash payment that does not serve the trust's purpose.

The trustee's basic fiduciary duty is to administer the trust. RESTATEMENT (SECOND) OF TRUSTS § 169. *Accord* 20 Pa.C.S. § 7771 (the trustee "shall administer the trust in good faith"); *Comment* (referencing, inter alia, Restatement (Second) of Trusts § 169 for background on trustee's duties to administer trust). A trustee is also obligated to deal impartially with the beneficiaries. "When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them." RESTATEMENT (SECOND) OF TRUSTS § 183. This duty exists whether the beneficiaries' interests are simultaneous or successive. *Id. Accord* 20 Pa.C.S. § 7773 (trustee's duty to act impartially).

The trust's purpose dictates how the trustee must deal with the beneficiaries. "Dealing impartially with all beneficiaries means that the trustee must treat all equitably in light of the purposes of the trust." *Robinson Twp.*, 83 A.3d at 959. Critical then is the determination of whether the purpose of the trust includes income entitlements. Again, the ERA Trust provides:

> Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27.

As we held in *PEDF II*, the purpose of the trust, as clearly expressed in its text, is the conservation and maintenance of Pennsylvania's public natural resources. *PEDF II*,

161 A.3d at 935.  There is no language that indicates an intent to create an income entitlement and the creation of simultaneous beneficiaries suggests otherwise.[18]

The benefit conferred on the beneficiaries through the ERA is the conservation and maintenance of the public natural resources.  In the proper administration of the trust, income may be generated as here through rental income.  In *PEDF II*, we broadly addressed the allowance of proceeds derived from the trust income, and we defined the trust's purpose as encompassing what may roughly be characterized as environmental benefits.  *PEDF II*, 161 A.3d at 930-35.  The Commonwealth attempted to isolate the phrase "for the benefit of all the people" from the remainder of the ERA to establish that allocating revenues generated from Marcellus Shale leases towards general budgetary matters broadly benefited all the people and was therefore permissible under the ERA. We disagreed and made clear that the Commonwealth must administer the trust in light of its purposes.

---

[18]  The absence of any language in the ERA to create an income entitlement is in contrast to the cases cited by the Commonwealth Court, in which the relevant instrument explicitly created successive beneficiaries and an income entitlement and instructed the trustee to pay those incomes.  *See, e.g.*, *Appeal of Eley*, 103 Pa. 300, 305 (Pa. 1883) ("In the body of his will, the testator … further directed that the portion thus given to his grandchildren should be held in trust … 'the interest or income arising from the same' to be paid to his said son, by the executors, during his natural life."); *Bruner's Will*, 70 A.2d at 223 ("Testator … direct[ed] to pay the net income semi-annually, as follows … . He also directed his trustees, for a period of three years after the death of both Joseph Bruner and Elizabeth Rodgers, to pay the net income … ."); *McClintock v. Dana*, 106 Pa. 386, 391–92 (Pa. 1884) (applying *Eley's Appeal* and noting, "Nor is there any provision, express or implied, in the will that the incomes are to be accumulated for those in remainder."); *In re Rosenblum's Estate*, 328 A.2d 158, 160 (Pa. 1974) ("Each beneficiary was made life tenant of the trust for his or her benefit.  The net income from each trust was to be paid to the life tenant during his or her lifetime, and on the death of the life tenant, the corpus was to be distributed free of trust … ."); *In re McKeown's Estate*, 106 A. 189 (Pa. 1919) (directing estate "to be held by the trustee, upon an active trust, 'to pay annually one-third of the net income from the said remaining three-fourths to each of my sons … with certain remainders over, not necessary to be considered at this time' ").

[T]he Commonwealth insists that the concluding phrase of Section 27, "for the benefit of all the people," confers discretion upon the General Assembly to direct the proceeds from oil and gas development toward **any** uses that benefit all the people of the Commonwealth, even if those uses do nothing to "conserve and maintain" our public natural resources. Commonwealth's Brief at 41 (citing *PEDF*, 108 A.3d at 168). We are wholly unconvinced. The phrase "for the benefit of all of the people" may not be read in isolation and does not confer upon the Commonwealth a right to spend proceeds on general budgetary items. Pa. Const. art I, § 27. The Commonwealth's fiduciary duty to "conserve and maintain" our public natural resources is a duty owed to the beneficiaries of the public trust, namely "the people, including generations yet to come," as set forth in the second sentence of Section 27. *Id.* The "people," in turn, are those endowed with "a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment," as set forth in the first sentence of Section 27. *Id.*

Accordingly, the [ERA] mandates that the Commonwealth, as a trustee, "conserve and maintain" our public natural resources in furtherance of the people's specifically enumerated rights. Thus understood in context of the entire amendment, the phrase "for the benefit of all the people" is unambiguous and clearly indicates that **assets of the trust are to be used for conservation and maintenance purposes**. *See Robinson Twp.*, 83 A.3d at 957 (holding that the "explicit terms of the trust require the government to 'conserve and maintain' the corpus of the trust"). Only within those parameters, clearly set forth in the text of Section 27, does the General Assembly, or any other Commonwealth entity, have discretion to determine the public benefit to which trust proceeds—generated from the sale of trust assets—are directed.

*PEDF II*, 161 A.3d at 934–35 (second emphasis added).

The Commonwealth argues that it can keep these incomes because they "do not dispose of or deprive the trust of any further benefit from the trust asset." Commonwealth's Brief at 26. That latter proposition is true but irrelevant to this question. In the absence of income entitlements, there is no authority for the trustee to generate

income from oil and gas assets and then use that income to benefit itself for non-trust purposes and not the beneficiaries.[19] *See, e.g.*, *Stahl v. First Pa. Banking & Tr. Co.*, 191 A.2d 386, 388 (Pa. 1963) ("It is a well recognized general rule that a trustee or fiduciary may not use trust property for his own benefit and if he does he is liable to a cestui que trust for profits made by him from the use of trust property.");[20] *Appeal of Baker*, 13 A. 487, 495 (Pa. 1888) ("[A] trustee will not, under any circumstances, be allowed to make a profit out of the trust funds. Whatever profit arises therefrom in any way belongs to the owner of the funds, and not to its custodian."); *Raybold v. Raybold*, 20 Pa. 308, 311-12 (Pa. 1853) ([T]here is no principle better settled than that a trustee is not permitted to obtain any profit or advantage to himself in managing the concerns of the cestui que trust.").

---

[19] It is unclear how the Commonwealth categorizes itself for its argument that it can allocate to itself income generated from the trust assets. If it views itself as the representative of the life tenants created by the Commonwealth Court, we have rejected that construction. Moreover, as discussed, it is violative of the purpose of the trust to divert revenue generated from the use of the trust assets for non-trust purposes. If the Commonwealth sees itself as the sovereign retaining some ownership in the public natural resources, that notion is dispelled by the express language of the ERA. Finally, as discussed in the text, an allocation of the income to itself as trustee violates its basic fiduciary duties as trustee.

[20] We note that the Commonwealth Court addressed fiduciary obligations, albeit in the context of how the mineral leases at issue here were structured. *See PEDF III*, 214 A.3d at 773 n.28. The court concluded that by using "standard industry leases, which have included rents, bonuses and royalties as forms of payments since oil and gas development began, DCNR did not structure or draft the leases in an attempt to remove rents and bonuses from the corpus of the trust." *Id*.

We agree with the Commonwealth Court that the Commonwealth did not breach its fiduciary duties by employing standard industry terms in the relevant leases. That conclusion, however, answers only whether the generation of income via those leases was acceptable. It does not address the critical question of whether it can then use that income to benefit itself and not the beneficiaries. *See supra* note 17.

The *Robinson Township* plurality stressed the ERA's placement within Article I of the Pennsylvania Constitution, the Commonwealth's Declaration of Rights. "The Declaration of Rights assumes that the rights of the people articulated in Article I of our Constitution—vis-à-vis the government created by the people—are inherent in man's nature and preserved rather than created by the Pennsylvania Constitution." *Robinson Twp.*, 83 A.3d at 948. Thus, the environmental public trust "was created by the people of Pennsylvania, as the common owners of the Commonwealth's public natural resources[.]" *Id.* at 956. Pursuant to fundamental principles of private trust law, we cannot conclude that the Commonwealth, as trustee of the constitutional trust created for the conservation and maintenance of the public natural resources that are owned by "all of the people," can divert for its own use revenue generated from the trust and its administration. The Commonwealth acts as a trustee managing the corpus, not as a sovereign owner that may use income in a manner that does not benefit the trust.

Finally, in determining the intent of the settlors in creating the trust, it is relevant to consider the "circumstances under which the trust is to be administered," RESTATEMENT (SECOND) OF TRUSTS, § 4, cmt. a. Those circumstances include that, at the time of the ERA's enactment, the Commonwealth was already generating revenue, including income, by leasing mineral rights. The Commonwealth established the Oil and Gas Lease fund in 1955 and the General Assembly required that all rents and royalties generated by leasing minerals be "exclusively used for conservation, recreation, dams, or flood control or to match any Federal grants which may be made for any of the aforementioned purposes." *PEDF II*, 161 A.3d at 919 (quoting statute). That was still the case in 1971, and it remained the case through 2009 when revenues soared as a result

of leasing lands within which the Marcellus Shale lies. From the perspective of the settlors, the ERA was enacted when the Commonwealth was already devoting the revenues generated by mineral leases to conservation purposes. Redirecting those revenues to non-trust purposes is inconsistent with the backdrop against which the ERA was enacted.

In this respect, we stress the distinction between the generation of income and the distribution of that income. Although the trustee (the Commonwealth) is authorized to generate income from trust assets in its discretion, it does not follow that the beneficiaries are entitled to distribution of those monies through allocation to the general fund. Such distribution is not supported by the purpose of the trust: to conserve and maintain the public natural resources. Thus, the income generated from bonus payments, rentals, and late fees must be returned to the corpus to benefit the conservation and maintenance of the public resources for all the people. To hold otherwise and allow allocation of the income to the general fund would permit the Commonwealth to use trust income to advance a non-trust purpose, an outcome we previously rejected. Private trust law principles preclude that outcome.[21]

## VI. Conclusion

The Commonwealth Court correctly concluded that the ERA did not provide a mechanism to allocate revenue generated from income produced based on the use of trust assets. The textual absence of an allocation mechanism has a straightforward

---

[21] We reiterate that "the legislature's diversion of funds from the Lease Fund (and from the DCNR's exclusive control) does not, in and of itself, constitute a violation of Section 27." *PEDF II*, 161 A.3d at 939. The General Assembly "would not run afoul of the constitution by appropriating trust funds to some other initiative or agency dedicated to effectuating Section 27." *Id.*

explanation: the settlors did not intend to create any income entitlements, hence eliminating the need to allocate receipts.  We conclude that the bonus payments, rentals and penalty interest qualify as income and not the sale of trust assets.  Since the ERA does not create an entitlement to income in the beneficiaries, the revenue generated from these Marcellus Shale leases must be returned to the corpus to benefit all the people.  Accordingly, we hold that the income generated from the revenue streams at issue must be returned to the corpus as a matter of trust law.  As a result, Sections 1604-E and 1605-E, as well as Section 1912 of the Supplemental General Appropriations Act of 2009, are facially unconstitutional.

Justices Todd, Dougherty and Wecht join the opinion.

Justice Wecht files a concurring opinion.

Justice Mundy files a concurring and dissenting opinion.

Chief Justice Baer and Justice Saylor file dissenting opinions.